624 S.E.2d 599

**DAIRYLAND INSURANCE COMPANY, Plaintiff Below, Appellee**

v.

**Stephanie Michelle CONLEY, Defendant/Third–Party Plaintiff Below, Appellee**

v.

**West Virginia National Auto Insurance Company, Third–Party Defendant Below, Appellant.**

No. 32704.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 2, 2005.

Decided Dec. 2, 2005.

Concurring Opinion of Chief Justice Albright Dec. 16, 2005.

James A. Varner, Sr., Debra T. Herron, Dana N. Bonnell, McNeer, Highland, McMunn and Varner, L.C., Clarksburg, for Appellant West Virginia National Auto Insurance Company.

Amy C. Crossan, Bouchillon, Crossan & Colburn, L.C., Huntington, for Appellee Stephanie Michelle Conley.

STARCHER, J.:

In this appeal from the Circuit Court of Cabell County, we are asked to review a circuit judge's summary judgment order, in favor of an insured, in an insurance declaratory judgment action.

This appeal centers on the validity of an insurance company notice, issued eleven days after its insured had been in an automobile

collision, telling its insured that it was cancelling her automobile liability insurance policy. The insurance company indicated in the notice that the cancellation was retroactive to a date that preceded the collision, and therefore that the insured had no coverage for the collision.

The circuit court's November 22, 2004 summary judgment order found the cancellation notice was ineffective. The circuit court ruled that a cancellation notice cannot be retroactive because state law requires an automobile insurance company to give an insured ten days advance notice before a policy cancellation takes effect. Because the insurance company failed to follow state law and prospectively notify the insured that her policy was being cancelled, the circuit court granted summary judgment to the insured and ruled that she was entitled to coverage under the insurance policy. The insurance company now appeals.

As set forth below, we affirm the circuit court's summary judgment order.

## I.

### Facts & Background

On August 15, 2001, appellee Stephanie Michelle Conley visited an insurance agent and completed an application for automobile liability insurance from the appellant, West Virginia National Auto Insurance Company ("West Virginia National"). The application stated that the "Eff[ective] Date" of coverage was August 15, 2001, and that "[c]overage will be bound no earlier than the date and time you sign below[.]" The application was signed and dated by Ms. Conley on August 15, 2001, at 10:00 a.m.

Ms. Conley presented the insurance agent with a check for $174.00, which the application called the "minimum required down payment." The application stated, however, that "if my premium remittance is not honored by the bank no coverage will be bound." [1]

Thereafter, on August 30, 2001, West Virginia National issued Ms. Conley an insurance policy bearing Policy No. WV1032724. West Virginia National delivered to Ms. Conley a declarations page setting forth the policy number and the extent of automobile liability coverage. Ms. Conley was also provided with a certificate of insurance and two "proof of insurance" cards. Each of these documents showed that the effective dates of coverage were from August 15, 2001, to February 15, 2002.

Also on August 30, 2001, West Virginia National mailed a "personal automobile premium billing statement" to Ms. Conley. This billing statement requested that Ms. Conley, in order to "avoid the termination of your coverages," make an installment payment of $88.55 by September 9, 2001. Additionally, the billing statement advised Ms. Conley that if she remitted her premium payments on a timely basis, "continuous coverage" would be ensured. The billing statement set forth the same policy number and the same effective policy period as the other documents: August 15, 2001, to February 15, 2002.

One day later, on August 31, 2001, Ms. Conley was involved in an automobile accident that, allegedly as a result of her negligence, caused injury to three individuals. Ms. Conley thereafter notified West Virginia National of the accident.

West Virginia National refused to provide a defense or coverage to Ms. Conley for the accident. By a letter dated September 11, 2001—twenty-seven days after her check was presented to the insurance agent with her

---

1. We are not unmindful of the dissimilar terms used in West Virginia National's application for defining the payment made by Ms. Conley. In one sentence, the application required the applicant to send the "minimum required down payment" with the application; in the next sentence, the application has the phrase "premium remittance." The application stated:

> Coverage will be bound no earlier than the date and time you sign below provided that the application is complete, signed by the applicant and the minimum required down pay-

ment is enclosed. I also agree that if my premium remittance is not honored by the bank no coverage will be bound. I further understand that if driving records of all individuals listed on this application differ from info provided, my premiums will be adjusted and written notice showing the adjusted premiums will be received.

For purposes of this appeal, however, we presume that the two phrases are synonymous and mean the insured's initial premium installment.

application and eleven days after her accident—West Virginia National informed Ms. Conley that her check had been dishonored by her bank and returned due to insufficient funds. Further, West Virginia National stated that "the above insurance has been rescinded as of August 15, 2001, resulting in no coverage provided to you by this company."

The individuals injured in the accident with Ms. Conley subsequently sought coverage from their own insurer, appellee Dairyland Insurance Company ("Dairyland"). After Dairyland had paid out nearly $26,000.00 to its insureds, Dairyland filed a complaint against appellee Ms. Conley on July 24, 2003, for subrogation. Ms. Conley answered Dairyland's complaint by denying she had been negligent. Further, Ms. Conley filed the instant third-party complaint for declaratory relief against appellant West Virginia National. In her third-party complaint, Ms. Conley alleged that because West Virginia National had improperly cancelled her policy, the policy was in effect on the date of the accident, and therefore that West Virginia National had improperly denied her coverage and a defense.

Ms. Conley subsequently filed a motion for summary judgment against West Virginia National, arguing that *W.Va.Code*, 33–6A–1(e)(7) [2000] [2] requires an insurance company to give an insured ten days notice prior to the cancellation of an insurance policy for failure of consideration to be paid upon the initial issuance of a policy. In an order dated November 22, 2004, the circuit court granted the motion for summary judgment, finding that West Virginia National "failed to comply with West Virginia Code § 33–6A–1(e)(7), in that it failed to provide Ms. Conley with ten (10) days notice of cancellation." Because West Virginia National "did not give appropriate notice of cancellation to Ms. Conley, there was an invalid cancellation and, hence, automobile insurance was in effect on the date of the automobile accident."

West Virginia National now appeals the circuit court's November 22, 2004 declaratory judgment order.

**2.** The statute is set out in the text at the beginning of Section III, *infra*. The statute was

## II.

### *Standard of Review*

In the instant appeal, the primary points of contention concern the circuit court's interpretation of the cancellation and notice provisions of *W.Va.Code*, 33–6A–1 [2000], and the circuit court's application of the statute to West Virginia National's policy. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). We also review a circuit court's interpretation of an insurance policy *de novo*. Syllabus Point 1, *Tennant v. Smallwood*, 211 W.Va. 703, 568 S.E.2d 10 (2002) ("Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law."); Syllabus Point 2, *Riffe v. Home Finders Associates, Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). ("The interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal.")

## III.

### *Discussion*

This appeal centers upon the circuit court's interpretation of *W.Va.Code*, 33–6A–1(e)(7) [2000] which states, in pertinent part and with emphasis added:

No insurer once having issued or delivered a policy providing automobile liability insurance for a private passenger automobile may, after the policy has been in effect for sixty days, or in case of renewal effective immediately, issue or cause to issue a notice of cancellation during the term of the policy except for one or more of the reasons specified in this section:

\* \* \*

Notwithstanding any of the provisions of this section to the contrary, no insurer

amended in 2004, but no changes were made pertinent to the instant appeal.

may cancel a policy of automobile liability insurance without first giving the insured thirty days' notice of its intention to cancel: Provided, That *cancellation of the insurance policy by the insurer for failure of consideration to be paid by the insured upon initial issuance of the insurance policy is effective upon the expiration of ten days' notice of cancellation to the insured.*

Appellee Ms. Conley argues that by enacting *W.Va.Code*, 33–6A–1(e)(7), the Legislature contemplated that an insurance company would issue an insurance policy to a new customer and subsequently there would be a "failure of consideration to be paid," that is, a check for some portion of the initial premium would be dishonored by the bank. In such circumstances, the appellee argues—and the circuit court agreed—that the statute requires the insurance company to give ten days advance notice to the insured prior to cancelling the policy. Ms. Conley asserts that the insurance company in this case did the exact opposite: it notified her on September 11 that it was terminating the policy retroactively to August 15. Accordingly, she takes the position that because West Virginia National did not give her ten days prospective notice before its cancellation took effect, the cancellation was legally insufficient, and therefore that the appellant is legally required to provide her with liability coverage and a defense for her August 31 accident.

Appellant West Virginia National, however, argues that the ten-day notice requirement in *W.Va.Code*, 33–6A–1(e)(7) is applicable only to situations where the insurance company has "issued or delivered a policy[.]" West Virginia National maintains that *W.Va. Code*, 33–6A–1(e)(7) is wholly inapplicable to this case because it never delivered or issued an insurance policy to Ms. Conley because no insurance contract was ever formed. The appellant's argument centers on the fact that an insured's payment of a premium is the consideration essential to the formation of an insurance contract. In the absence of a premium—particularly when the customer tries to pay premiums with a worthless check—the appellant argues there is no insurance contract, and no coverage. The appellant therefore argues that this case is controlled by West Virginia National's insurance application language rather than West Virginia law. West Virginia National's insurance application explicitly stated that "if my premium remittance is not honored by the bank no coverage will be bound." In the absence of consideration by the appellee, the appellant argues that no insurance contract was formed on August 15, 2001, no policy was ever issued and, therefore, no notice of cancellation was appropriate or required by *W.Va.Code*, 33–6A–1(e)(7).

The appellee counters the appellant's argument in a two-fold manner. First, as a factual matter, the appellee challenges the appellant's claim that "no policy was issued" by pointing out that West Virginia National provided Ms. Conley with a policy number; a declarations page describing her liability insurance coverage; a certificate of insurance; two proof of insurance cards for the vehicle; and a billing statement, all setting the policy period from August 15, 2001, to February 15, 2002. Furthermore, the appellee points out that West Virginia National advised Ms. Conley on September 11, 2001, that it had "rescinded" her policy; Ms. Conley asserts that "rescind" is defined as "to cancel" or "to take back," terms that infer that even West Virginia National believed a policy was in effect that was being cancelled. In sum, the appellee argues that the facts establish that West Virginia National believed it issued a new insurance policy to Ms. Conley.

Second, as a legal matter, the appellee asserts that West Virginia National cannot use its application language to contractually defeat the effect of *W.Va.Code*, 33–6A–1. The appellee contends that the phrase "failure of consideration to be paid" in *W.Va. Code*, 33–6A–1(e)(7) includes those situations where a customer pays an initial premium with a bad check. The appellee contends that once an insurance company chooses to issue a new automobile insurance policy to a new customer, and there is later a failure of consideration to be paid by the customer in any fashion, *W.Va.Code*, 33–6A–1 requires the insurance company to afford the customer ten days notice before terminating the policy.

After carefully considering the parties' arguments, and examining the legislative histo-

ry of *W.Va.Code*, 33–6A–1, we accept the appellant's interpretation of the statute as correct. Our Legislature enacted *W.Va. Code*, 33–6A–1 specifically intending to prevent the retroactive cancellation practices such as that done by the appellant in this case. Indeed, history reveals that this and similar statutes in other states were enacted—often at the urging of the insurance industry—in reaction to the public perception of a nationwide legacy of arbitrary and capricious policy termination practices by insurance companies. Furthermore, it was perceived that these termination practices usually worked to the detriment of the innocent general public. To counter these termination practices, to protect insureds, and—most importantly—to protect innocent third parties who might be injured by the insureds, legislatures enacted statutes with two goals: restricting the reasons insurance companies could rely upon to terminate automobile liability policies, and requiring insurance companies to provide advance notice of the effective date of the termination.

## A.

### State Efforts to Place Limits on the Termination of Insurance Policies

Prior to the late 1960s, the insurance statutes of most states did not require an insurance company to have a valid reason for cancelling an insurance policy, or to warn a policyholder that a lapsing policy would not be renewed. An insurance company was entitled to terminate a policy at any time, without giving any reason or motive. Irvin E. Schermer and William Schermer, 2 *Automobile Liability Insurance*, § 26.01[4] at 26–18 (3d. Ed. 1995). Legislators, including the United States Congress, who studied the insurance industry in the late 1960s found that the chief complaint of the general public was not high premium rates, but rather "the abusive termination practices of the insurance companies." Alan J. Zedonis and Paul M. Doyle, Note, "Along for the Ride: An Examination of the Merit System and Policy Terminations Provisions of the Massachusetts No–Fault Law," 21 Cath.U.L.Rev. 436, 447 (1972), *citing Hearings on H.J. Res. 958 Before the Subcomm. on Commerce and Finance of the House Committee on Interstate and Foreign Commerce*, 90th Cong., 2d. Sess. 11, 29, 68, 69 (1968).[3]

To counter public criticism of insurance industry termination practices, some insurance companies voluntarily adopted policy language limiting their rights to cancel or refuse to renew insurance policies.[4] However, because many insurance companies continued to defend their seemingly arbitrary

---

**3.** One article summarizing the congressional findings said:

> The Senate Judiciary Committee in its staff study reported that underwriting guides from 25 insurance companies listed nine companies refusing to insure "any operator, or risk, cancelled, refused, or declined by another company"; five companies declining to write insurance for "nationals of other countries"; three companies rejecting all "persons living in substandard environmental areas." Agents were cautioned in guidelines to be wary of applicants who speak poor English, are actors, or in similar artistic occupations, and are "not as conservative as we like to see in the average risk." If a protest were made, companies retained the right to refuse renewal on the ground the customer had an "antagonistic attitude."

"Auto Insurance Pot Boils Over," 3 *Trial Magazine* 12 (Oct.-Nov. 1967). Another article noted:

> The hearings before the House Committee are filled with examples of what must be classified as arbitrary terminations. Senator Gaylord Nelson of Wisconsin told of a policyholder

who asked his insurance company why he had been cancelled. The company replied that his neighborhood was "going downhill."

21 Cath.U.L.Rev. at 447–48.

**4.** West Virginia National's insurance policy contains such language limiting its right to cancel, and imposing advance notice requirements, stating:

> 15. Cancellation . . .
> (b) Cancellation by the Company of a policy which has been in effect for less than sixty (60) days: This policy may be canceled by the Company by mailing to the insured named in Item 1 of the declarations at the address shown in this policy, written notice stating when, not less than ten days thereafter, such cancellation shall be effective, provided that the policy has not been in effect less than sixty (60) days and this is not a renewal policy. The policy may be canceled by the Company upon actual notice to the insured or by mailing notice of such cancellation.

West Virginia National asserts that this policy language is not applicable to the instant case

and capricious termination practices and refused take voluntary action, the insurance industry "propos[ed] and support[ed] state legislation to regulate cancellation and nonrenewal." James D. Ghiardi and Robert O. Wienke, "Recent Developments in the Cancellation, Renewal and Rescission of Automobile Insurance Policies," 51 Marq.L.Rev. 219, 220 (1968).[5] As commentators noted in 1968:

> There is little question that problems exist as to the cancellation and nonrenewal of automobile insurance policies and that legislation is needed to prevent arbitrary and capricious cancellations. Legislation should be enacted which would limit the reasons for which insurers may cancel automobile insurance policies since any prior cancellation may hinder the policyholder in obtaining future coverage, or may increase the premium which he would be required to pay[.]

51 Marq.L.Rev. at 250.

State legislatures, in response to the perception of a growing problem, began to enact two types of legislation to regulate the termination of automobile liability insurance policies: legislation limiting the *reasons why* insurance companies could cancel or refuse to renew policies; and legislation requiring that policyholders receive *advance notice* of the effective date of cancellation of a policy.

By 1968, at least twenty-four state legislatures—including the West Virginia Legislature—had enacted laws placing restrictions on the reasons why an insurance company

could terminate a policy. 51 Marq.L.Rev. at 220. For example:

> [T]he recently enacted Illinois statute . . . provides that after the insurer has a sixty day underwriting period in which to investigate the risk, the company can cancel for specified reasons. These reasons include: nonpayment of premium; material misrepresentations; violations of the terms or conditions of the policy; failure to disclose accidents or violations; failure to disclose necessary information to the insurer; aiding fraudulent claims; convictions of certain traffic violations; an accident record, conviction record (criminal or traffic), physical, mental or other condition which is such that his operation of an automobile may endanger public safety; or certain changes in the condition or use of the insured behicle [sic]. . . .

> Wisconsin has recently enacted a statute which prohibits the insurer from basing his cancellation or refusal to renew upon certain prohibited grounds [such as age, residence, race, color, creed, national origin, ancestry or occupation of anyone who is an insured].

51 Marq.L.Rev. at 225–26.

Furthermore, by 1968 at least nineteen state legislatures had enacted laws requiring insurance companies to provide the insured with advance notice of the effective date of cancellation of a policy. "These statutes require that the effective date of cancellation . . . be at least ten to forty-five days from the date of the mailing of the notice." 51 Marq.

---

because no insurance contract was ever formed, and no policy was ever issued. We therefore do not consider the effect of this policy language in this case, or whether this policy language is in conflict with *W.Va.Code,* 33–6A–1.

5. In 1967, four variations of model automobile insurance cancellation statutes were proposed by The American Insurance Association, the American Mutual Insurance Association, and the National Association of Independent Insurers. 51 Marq.L.Rev. at 221. Two of the organizations—the AIA and AMIA—proposed that insurance companies should be statutorily limited to cancelling automobile liability policies for only two reasons: "nonpayment of premium and the loss of driving privileges" after the "sixty day underwriting period" at the outset of the policy period, 51 Marq.L.Rev. at 221, 226.

The National Association of Insurance Commissioners has also proposed model cancellation legislation. Section 4 of the "Automobile Insurance Declination, Termination and Disclosure Model Act" states that "No notice of cancellation of a policy of automobile insurance shall be effective unless it is based upon at least one of the following reasons. . ." and goes on to list numerous reasons an insurance company may employ when cancelling a policy. Those reasons include nonpayment of premiums, fraud or material misrepresentation in obtaining the policy or in presenting a claim under the policy, revocation of the insured's license, or that "[t]he insured motor vehicle is . . . [s]o mechanically defective that its operation might endanger public safety." *See* National Association of Insurance Commissioners, IV *NAIC Model Laws, Regulations and Guidelines* at 725–1 to—16 (1997).

L.Rev. at 221–22. A model act proposed by the National Association of Insurance Commissioners demonstrates the time limits legislatures were imposing upon insurance companies, stating:

> No insurer shall cancel an automobile insurance policy unless a written notice of cancellation is mailed or delivered to the last known mailing address of the named insured as shown in the records of the insurer at least twenty (20) days prior to the effective date of cancellation, except that when cancellation is for nonpayment of premium, notice shall be mailed or delivered to the named insured at the last known mailing address as shown in the records of the insurer at least ten (10) days prior to the effective date of cancellation. Such notice shall be accompanied by a written explanation of the specific reasons for the cancellation.

*See* National Association of Insurance Commissioners, "Automobile Insurance Declination, Termination and Disclosure Model Act" § 3(B), IV *NAIC Model Laws, Regulations and Guidelines* at 725–3 (1997).

The West Virginia Legislature adopted *W.Va.Code*, 33–6A–1 in 1967, and in doing so initially limited only the reasons why an insurance company could cancel an existing policy. It was not until 1981 and 1982 that the Legislature adopted modifications to *W.Va.Code*, 33–6A–1—modifications which are the subject of the instant appeal—which required an insurance company to give a policyholder advance notice of the effective date of cancellation of a policy.

### B.

### *The 1967 Adoption of Statutory Limits on the Reasons for Cancellation*

In 1967 the Legislature enacted Senate Bill 30 which created Article 6A of Chapter 33, "relating to the cancellation of automobile liability insurance." *1967 Acts of the Legislature,* Chapter 98 at 455.[6] The first section of the new article, *W.Va.Code*, 33–6A–1 [1967], provided that an insurance company could only cancel a policy on certain legislatively-approved grounds.[7] The first and foremost

**6.** Concurrent with the adoption of limits upon an insurance company's ability to arbitrarily cancel an automobile insurance policy, the Legislature also adopted legislation expanding the coverage that was required to be included in automobile insurance policies. *See 1967 Acts of the Legislature,* Chapter 97 (adding a new section, *W.Va. Code,* 33–6–31, "relating to provisions in a motor vehicle liability policy and requiring that such policies include an omnibus clause and coverage for loss by uninsured motorists.").

**7.** The 1967 iteration of *W.Va.Code,* 33–6A–1, entitled "Cancellation prohibited except for specified reasons," provided in full:

> No insurer once having issued or delivered a policy providing automobile liability insurance in this state insuring a private passenger automobile shall, after the policy has been in effect for sixty days, or in case of renewal effective immediately, issue or cause to issue a notice of cancellation during the term of the policy except for one or more of the following specified reasons:
>
> (a) The named insured fails to discharge when due any of his obligations in connection with the payment of premium for such policy or any installment thereof;
>
> (b) The policy was obtained through material misrepresentation;
>
> (c) The insured violates any of the material terms and conditions of the policy;
>
> (d) The named insured or any other operator, either resident in the same household or

who customarily operates an automobile insured under such policy:

> (1) Has had his operator's license suspended or revoked during the policy period; or
>
> (2) Is or becomes subject to epilepsy or heart attacks, and such individual cannot produce a certificate from a physician testifying to his ability to operate a motor vehicle.
>
> (e) The named insured or any other operator, either resident in the same household or who customarily operates an automobile insured under such policy, is convicted of or forfeits bail during the policy period for any of the following:
>
> (1) Any felony or assault involving the use of a motor vehicle;
>
> (2) Negligent homicide arising out of the operation of a motor vehicle;
>
> (3) Operating a motor vehicle while under the influence of intoxicating liquor or of any narcotic drug;
>
> (4) Leaving the scene of a motor vehicle accident in which the insured is involved without reporting as required by law;
>
> (5) Theft of a motor vehicle or the unlawful taking of a motor vehicle;
>
> (6) Making false statements in an application for a motor vehicle operator's license;
>
> (7) A third violation, committed within a period of twelve months, of any moving traffic violation which constitutes a misdemeanor, whether or not the violations were repetitions of the same offense or were different offenses.

among the various reasons insurance companies were permitted to cancel a policy was the non-payment of premiums by the insured. The cancellation of an insurance policy on any ground other than those listed in the statute was void. *See W.Va.Code*, 33–6A–2 [2000] ("Any purported cancellation by an insurer of a policy of automobile liability insurance which has been in effect for sixty days and which has been renewed shall be void if the purported cancellation is contrary to section one of this article.").

The statute—as originally written—only applied to insurance policies that had been in effect for sixty days; for the first fifty-nine days, the insurance company did not have to have a reason for cancelling the policy. This sixty-day period was adopted because it is the custom of the insurance industry—and sound public policy, to boot—to provide insurance customers with on-the-spot, temporary insurance coverage in the form of a binder until the customer's application information can be verified and a formal policy issued.[8] This sixty-day period allows insurance underwriters a short period in which to

investigate a customer's application and determine whether or not the risk is acceptable.[9] *See* Syllabus Point 1, *Conn v. Motorist Mut. Ins. Co.*, 190 W.Va. 553, 439 S.E.2d 418 (1993) ("W.Va.Code, 33–6A–3 (1967), states that if an automobile liability insurance policy has been in effect sixty days or if renewed, the insurer or its duly authorized agent shall in the notice of cancellation specify the reason or reasons relied upon by such insurer for such cancellation.")

Missing from the 1967 variation of *W.Va. Code*, 33–6A–1 was any statutory requirement that a policyholder receive advance notice from the insurance company that their insurance policy was being cancelled.[10] That requirement first appeared in 1981.

C.

*The 1981 Requirement of Notice of Cancellation to an Insured*

In 1981, the Legislature adopted a series of initiatives designed to ensure that every motor vehicle operating within the State was covered by an automobile liability insurance

---

8. "Where the insurance is to become effective or the risk attach before the application has been formally accepted by the insurer, frequently a limited acceptance or 'binding slip' is given stating such fact." Syllabus Point 3, *Hallauer v. Fire Ass'n of Philadelphia*, 83 W.Va. 401, 98 S.E. 441 (1919).

9. *See, e.g., Powell v. Walker*, 428 Pa.Super. 31, 40–41, 630 A.2d 16, 21 (1993) ("Pursuant to the sixty-day window in which the insurer may exercise the common law right of rescission, insurers can immediately underwrite risks via the issuance of binders and then verify the insured's representations within sixty days to protect themselves from liability for a third-party suit against a dishonest insured. However, insurers are not given more than sixty days from the policy's inception to conduct their investigation[.]"); *Klopp v. Keystone Ins. Companies*, 528 Pa. 1, 7 n. 5, 595 A.2d 1, 4 n. 5 (1991) ("[T]he legislature ... intended to provide the insurance carriers with a grace period to thoroughly investigate its prospective clients. This grace period also serves consumers by providing some certainty that if there is a problem with their application after sixty days, they will be entitled to a formal notice procedure before their coverage is terminated."); *Ferrell v. Columbia Mut. Cas. Ins. Co.*, 306 Ark. 533, 539, 816 S.W.2d 593, 596 (1991) ("[O]ur statute clearly provides a sixty day grace period during which the common law rules of rescission apply."); *Hudson v. State Security Ins. Co.*, 555 S.W.2d 859, 861 (1977) ("It is clear that

the purpose of these statutes is to give the insurer a 60 day probationary period to determine whether it will exercise its option to cancel the policy, or thereafter be bound[.]"); *Saunders v. Mittlieder*, 195 Neb. 232, 236, 237 N.W.2d 838, 840 (1976) ("We conclude the intent of subsection (2) to exclude the effect of section 44–515, R.R.S. 1943, for the first 60 days, was intended solely to give the insurance company a short period for investigation to determine whether or not other reasons might make the risk unacceptable.").

10. We note, however, that the Legislature was aware in 1967 that notice provisions could be included in legislation pertaining to the cancellation of insurance policies in the middle of the coverage period. This is apparent in *W.Va.Code*, 33–6A–4 [1967], which limits an insurance company's ability to refuse to renew an insurance policy at the end of the coverage period. *W.Va. Code*, 33–6A–4 stated that an insurance company could not refuse to renew an automobile liability insurance policy "unless such nonrenewal is proceeded by at least forty-five days of advance notice to the named insured of such insurer's election not to renew such policy." *1967 Acts of the Legislature*, Ch. 98 at 458. This forty-five-day notice limitation on the non-renewal of a policy is in the current version of the statute. *See W.Va.Code*, 33–6A–4(a) [2004].

policy. Statutes were modified so that no vehicle could be registered without the vehicle owner providing evidence of insurance or financial responsibility to the commissioner of motor vehicles. One entirely new statutory scheme, Article 2A of Chapter 17D, created criminal and civil penalties for driving a motor vehicle that did not have certain minimum limits of liability and property insurance. *See 1981 Acts of the Legislature,* Chapter 157 at 722–727 (creating *W.Va.Code,* 17D–2A–7 (providing for suspension or revocation of license for failing to have insurance) and –9 (providing for criminal penalties)).

As part of these 1981 initiatives, the Legislature adopted two statutes that imposed certain notice requirements for insurance companies to follow when an insurance policy was being cancelled.

First, the Legislature amended *W.Va. Code,* 33–6A–1 to, for the first time, include a notice requirement. The statute continued to permit an insurance company to cancel a policy for any reason if a policy had been in effect for less than sixty days, and cancel for the limited statutory reasons if the policy was in effect for sixty days or more. However, the statute mandated that any cancellation, regardless of the reason or lack thereof, would not take effect until thirty days after notice of the cancellation was given to the policyholder. As amended, *W.Va.Code,* 33–6A–1(e)(7) [1981] stated, in pertinent part:

> Notwithstanding any of the provisions of this section to the contrary, no insurance company may cancel a policy of automobile liability insurance without first giving the insured thirty days' notice of its intention to cancel.

*1981 Acts of the Legislature,* Chapter 157 at 727–28.

**11.** As we discuss *infra, W.Va.Code,* 17D–2A–5 was substantially amended and modified in 1982, and no longer imposes this notice requirement upon insurance companies.

**12.** One law review article encouraged legislatures to enact notice legislation like that adopted in West Virginia in 1981 for the following reasons:

> The policyholder should receive adequate advance notice of a cancellation or nonrenewal,

Second, the Legislature required insurance companies to notify *both* the policyholder and the commissioner of motor vehicles whenever an automobile insurance policy was being cancelled, and the cancellation could not take effect until thirty days after the notice was given. *W.Va.Code,* 17D–2A–5(a) [1981] stated:

> Cancellation or termination of the insurance policy by the insurance carrier is effective only upon the expiration of thirty days' notice of cancellation ... to the commissioner of motor vehicles and to the insured.[11]

Once the commissioner of motor vehicles received the notice, the commissioner was empowered to suspend the vehicle registration of the uninsured vehicle. *1981 Acts of the Legislature,* Chapter 157 at 724–25.

We believe that the thirty-day notice requirements in these two statutes were designed to ensure that a policyholder had sufficient time to take remedial action to correct an erroneous cancellation notice or to obtain replacement insurance coverage. The purpose of a cancellation notice "is to make the insured aware that the policy is being terminated and to afford the insured the time to obtain other insurance prior to termination of the existing policy." *Conn v. Motorist Mut. Ins. Co.,* 190 W.Va. 553, 557, 439 S.E.2d 418, 422 (1993), *quoting Automobile Club Ins. Co. v. Donovan,* 550 A.2d 622, 623 (R.I.1988). The notice requirements also ensure that the commissioner of motor vehicles has time to take action against the policyholder. Lastly, the requirements ensure that innocent third parties who might be injured by a financially-irresponsible policyholder's negligence were protected.[12]

But the effect of these 1981 amendments is obvious: if an insurance company chose to issue an automobile liability policy to an in-

> to allow him sufficient time to correct a notice based upon a "mistaken belief" or to obtain other coverage. The public should be protected from motorists who may become financially irresponsible as a result of an arbitrary cancellation.

James D. Ghiardi and Robert O. Wienke, "Recent Developments in the Cancellation, Renewal and Rescission of Automobile Insurance Policies," 51 Marq.L.Rev. 219, 250 (1968).

sured, then the insurance company could not cancel the policy for *any reason* without first giving the insured and the commissioner of motor vehicles thirty days' notice of the cancellation date; in the absence of thirty days notice, any notice of cancellation was void and coverage continued to be available under the policy.

The way the thirty-day notice of cancellation requirement in *W.Va.Code*, 33–6A–1(e)(7) works was demonstrated by Justice Davis in *Bailey v. Kentucky National Ins. Co.*, 201 W.Va. 220, 496 S.E.2d 170 (1997). In *Bailey*, the insured purchased a high-risk automobile insurance policy effective from May 25, 1993, to May 25, 1994. The insured paid one-fourth of the annual premium to the insurance company at the time his policy was issued on May 25, 1993. One month later, the insurance company sent the insured a premium notice indicating that the first of five installments for the remainder of his annual premium would be due on July 29, 1993.

When the insured in *Bailey* failed to pay his first installment premium by the due date, the insurance company mailed him a notice of cancellation dated August 2, 1993. The cancellation notice indicated that the automobile insurance policy would be cancelled effective seventeen days later, on August 19, 1993. The cancellation notice clearly stated that the policy was being cancelled "due to nonpayment of premium." Furthermore, on August 25, 1993, the insurance company mailed the insured a $16.78 check as a "premium refund," and the insured received and cashed the check.

On September 16, 1993, the insured in *Bailey* was killed in an automobile accident. The insured's family sought to recover underinsured motorist benefits from the insurance company. The insurance company denied coverage, claiming that the policy had been effectively cancelled on August 19, 1993. The insured's family filed a declaratory judgment action against the insurance company, but a circuit court concluded that the policy

had been properly cancelled prior to the insured's death.

In 1997 in *Bailey*, this Court unanimously reversed the circuit court on an issue similar to the issue in the instant case. We agreed that the insurance company's reason for cancellation—a failure to pay premiums—was proper under the law. What was problematic was the timing of the notice of cancellation. We found that because of the operation of *W.Va.Code*, 33–6A–1(e)(7), the insurance company was required to give the insured thirty days of advance notice that his policy was being cancelled. Because the insurance company only gave the insured seventeen days of advance notice, we determined that the insurance policy had not been properly cancelled and that the policy was still in effect at the time of the insured's death. Discussing *W.Va.Code*, 33–6A–1(e)(7), we stated:

> This provision effectively states that an insurer may not cancel a policy of insurance that has been in effect for sixty days, for one of the enumerated reasons, unless it first provides the insured with thirty days' notice.[13]

*Bailey*, 201 W.Va. at 227, 496 S.E.2d at 177. Applying the statute to the facts, we said:

> Although the stated reason for cancellation was proper, Kentucky National's purported cancellation was not valid because it failed to provide the decedent with the requisite thirty days' notice. With respect to a similar situation we have recognized that "[w]here there has been an invalid cancellation, the automobile liability insurance policy remains in effect until the end of its term or until a valid cancellation notice is perfected, whichever event first occurs." *Conn v. Motorist Mut. Ins. Co.*, 190 W.Va. 553, 558, 439 S.E.2d 418, 423 (1993) (citation omitted). Since Kentucky National failed to perfect a valid notice of cancellation, its purported cancellation was void, and the decedent's automobile insur-

---

**13.** Pertinent to the instant case, we also noted that *W.Va.Code*, 33–6A–1(e)(7) contains "[a]n exception to the thirty days' requirement ... where an insured fails to pay consideration 'upon initial issuance of the insurance policy'; in this scenario, an insurer must only provide the insured with ten days' notice of its intention to cancel." *Bailey*, 201 W.Va. at 227, 496 S.E.2d at 177.

ance policy remained in effect at the time of his fatal accident on September 16, 1993. 201 W.Va. at 228, 496 S.E.2d at 178.

The facts in *Bailey* involved a situation somewhat different from the instant case: the insured in *Bailey* had paid the premiums due upon the initial issuance of his insurance policy and had missed a subsequent installment premium. Still, interpreting and applying language added to *W.Va.Code,* 33–6A–1(e)(7) in 1981, we concluded in *Bailey* that even though the insured had failed to pay the installment premiums due, the statute mandated that the insurance company give the insured thirty days of notice before cancelling the policy. If the insurance company provided anything less than thirty days' notice, *Bailey* made clear that the cancellation was wholly ineffective and coverage continued for the rest of the policy term, or until a proper cancellation notice was provided. *Bailey,* 201 W.Va. at 228, 496 S.E.2d at 178.

Taken one step further, and read literally, it appears that the 1981 variation of *W.Va. Code,* 33–6A–1(e)(7) had an even more far-reaching financial effect on the insurance industry than what was shown in *Bailey.* The 1981 amendments placed the insurance industry in the position of providing thirty days or more of insurance coverage to individuals who had not only missed a premium payment, but who had never made an initial premium payment in the first place. In other words, if an insured failed to even attempt to make a premium payment with his or her insurance application, but the insurance company still chose to issue documentation evidencing that liability coverage existed on the date the application was completed, then under the 1981 amendments, the insured, the commissioner of motor vehicles, and the general public were entitled to presume that the insurance customer was insured up to the limits of the policy. Even though the insured had never paid a dime in premiums, the policy could not be properly cancelled until thirty days after the insurance company

gave notice that the policy was being cancelled.

The Legislature, realizing this effect of its 1981 amendment, reacted quickly to ameliorate its effect on the insurance industry.

## D.

### *The 1982 Modifications to the Notice Requirements of W.Va.Code, 33–6A–1*

The following year, the Legislature acknowledged that it had placed a heavy burden upon insurance companies by imposing a thirty-day limit before a policy could be cancelled, even when a new policyholder had failed to pay any premiums. The Legislature therefore softened—but did not eliminate—the notice requirements that it had imposed upon insurance companies in its 1981 enactments.

To be sure, the 1982 variation of *W.Va. Code,* 33–6A–1 continued to impose the 1981 requirement that "no insurance company may cancel a policy of automobile liability insurance without first giving the insured thirty days' notice of its intention to cancel[.]" However, the Legislature revised *W.Va.Code,* 17D–2A–5, and completely eliminated the requirement that insurance companies give insureds *and* the commissioner of motor vehicles 30 days' advance notice before a cancellation could take effect. The revised statute simply required insurance companies to "notify the commissioner of motor vehicles ... of the effective date of cancellation or termination" of a motor vehicle policy. *1982 Acts of the Legislature,* Chapter 106 at 644–45.[14]

Likewise, the Legislature adopted language into *W.Va.Code,* 33–6A–1 which was intended to reduce from thirty days to ten days the notice required to be given to a new insurance customer "upon cancellation of automobile liability policy for failure of consideration upon initial issuance of policy." *1982 Acts of the Legislature,* Chapter 106 at 638.

---

**14.** The current version of the statute, *W.Va.Code,* 17D–2A–5(a) [1992] provides in part:

An insurance company shall provide the division of motor vehicles with a cancellation notice within ten days of the effective date of

cancellation whenever the company issues or causes to be issued a cancellation under the provisions of [*W.Va.Code,* 33–6A–1(b)–(e) ] of this code.

As the statute was finally enacted, *W.Va. Code*, 33–6A–1(e)(7) [1982] read, in pertinent part:

> Notwithstanding any of the provisions of this section to the contrary, no insurance company may cancel a policy of automobile liability insurance without first giving the insured thirty days' notice of its intention to cancel: *Provided*, That cancellation of the insurance policy by the insurance carrier for failure of consideration to be paid by the insured upon initial issuance of the insurance policy is effective upon the expiration of ten days' notice of cancellation to the insured.

*1982 Acts of the Legislature*, Chapter 106 at 654.

Although *W.Va.Code*, 33–6A–1 has been modified by the Legislature five times since 1982,[15] the requirement that an insurance company give an insured ten days of advance notice before an automobile policy is cancelled for "failure of consideration to be paid by the insured upon initial issuance of the insurance policy" remains in the statute. This 1982 modification to *W.Va.Code*, 33–6A–1 forms the focal point of the instant appeal.

### E.

### *Interpreting W.Va.Code, 33–6A–1(e)(7)*

■ *W.Va.Code*, 33–6A–1(e)(7) [2000] states that "ten days' notice of cancellation to the insured" must be given in advance before a cancellation notice becomes effective when the policy is being terminated "for failure of consideration to be paid by the insured upon initial issuance of the insurance policy."

The appellant raises a novel interpretation of the phrase "failure of consideration to be paid" in *W.Va.Code*, 33–6A–1(e)(7), and asserts that the phrase must be read in light of two cases with fact patterns that pre-date the 1967 enactment of the statute. The appellant argues that this phrase only applies when the consideration for issuance of the policy is the applicant's *promise* to pay the premium at a later date; the notice provisions of the statute would be triggered if the applicant later fails to make the promised

payment. Conversely, the appellant argues that the statute does not apply when, like in the current case, the insurance company demands an actual payment of the premium with the application for insurance.

The appellant further argues that when an insurance company demands the actual payment of the premium, and that payment is by a check that is later dishonored by the bank, then no consideration has been given for the contract and no insurance policy is "issued or delivered" under the statute. For instance, in *Nationwide Mutual Ins. Co. v. Smith*, 153 W.Va. 817, 827, 172 S.E.2d 708, 713 (1970) the Court stated that, "In the absence of the payment of the premium which was to have been paid when the policy was delivered the policy was invalid from its inception[.]" Likewise, in *Hare v. Connecticut Mutual Life Ins. Co.*, 114 W.Va. 679, 681, 173 S.E. 772, 773 (1934) the Court concluded, "The premium is the price of the insurance and payment of the premium is the essence of the insurance contract. No payment—no insurance. A worthless check is not a payment of anything." Applied to Ms. Conley, the appellant argues that because she paid her initial premiums with a worthless check, no insurance contract was issued, delivered or formed, and therefore the appellant had no duty to provide her with advance notice of the cancellation of her policy.

■ We reject the appellant's interpretation of *W.Va.Code*, 33–6A–1(e)(7). First, the appellant cites us to no West Virginia automobile insurance cases that post-date the adoption of *W.Va.Code*, 33–6A–1 in 1967. The first case cited by the appellant, *Nationwide Mutual Ins. Co. v. Smith*, was issued by the Court in 1970, but the facts of the case concern an automobile insurance policy issued in 1964 and an accident that occurred in 1965. The other case cited by the appellant, *Hare v. Connecticut Mutual Life Ins. Co.*, was issued by the Court in 1934 and concerns life insurance. The Legislature is plainly empowered to alter the common law, and appears to have done so when it enacted *W.Va.Code*, 33–6A–1 in 1967. Syllabus, *Per-*

---

**15.** *See 1994 Acts of the Legislature*, ch. 111; *1996 Acts of the Legislature*, Ch. 183; *1998 Acts of the Legislature*, Ch. 183; *2000 Acts of the Legislature*, Ch. 147; and *2004 Acts of the Legislature*, Ch. 87.

*ry v. Twentieth St. Bank,* 157 W.Va. 963, 206 S.E.2d 421 (1974) ("By virtue of the authority of Article VIII, Section 21 of the Constitution of West Virginia and of Code, 1931, 2–1–1 it is within the province of the Legislature to enact statutes which abrogate the common law.").

■ We do concede that the Legislature's choice of the phrase "failure of consideration to be paid" injects some ambiguity into the statute. The common law of contracts gives the word "consideration" a much broader definition than mere payment of money. *See, e.g.,* Syllabus Point 1, *Tabler v. Hoult,* 110 W.Va. 542, 158 S.E. 782 (1931) ("A valuable consideration may consist either in some right, interest, profit, or benefit accruing to the one party or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other."). But, contrary to the appellant's position, in the context of insurance "consideration" can be the actual payment of money for premiums rather than just a future promise to pay. *W.Va.Code,* 33–1–17 [1957] defines the word "premium" in the insurance code as "the consideration for insurance, by whatever named called." So, while the Legislature may have intended a broader application for the statute, a "failure of consideration to be paid" in *W.Va. Code,* 33–6A–1(e)(7) can clearly be read to mean a "failure of premiums to be paid." In the instant case, we are presented with a fact pattern implicating a failure of premiums to be paid on the issuance of a new insurance policy, and so we do not endeavor to explore other potential interpretations for the statute.

■ We believe that the legislative history behind the enactment and modification of the statute makes the Legislature's intent clear: if an insurance company chooses to issue a new policy of automobile liability insurance to an insured, and the insured fails to pay the initial premium or otherwise provide necessary consideration for the new policy, the insurance company may cancel the policy. However, the cancellation of the policy can take effect no earlier than ten days after notice of the cancellation is provided to the insured.

■ Certainly, "[t]he purpose of statutory and policy provisions requiring notice to the insured prior to cancellation is to enable the insured to obtain insurance elsewhere before he or she is subjected to risk without protection." 2 *Couch on Insurance,* § 32:1 at 32–6 (3d. Ed. 2005). But our holding today also recognizes that motorists carry insurance not only for their own protection, but also for the benefit of third parties who may suffer through the negligence of the motorist. Automobile liability insurance provides motorists and third parties with protection against the foreseeable consequences of driving. When an insured fails to pay consideration upon the issuance of a new insurance policy, *W.Va.Code,* 33–6A–1(e)(7) makes the ten-day notice a requisite for an effective cancellation between the parties to the policy as well as to the public. *See Erie Ins. Exchange v. Gosnell,* 246 Md. 724, 734, 230 A.2d 467, 472 (1967) ("The Act makes the 30 day notice a requisite for an effective cancellation as between the parties to the policy as well as to the public[.]")

The insurance industry directly benefits from the current legislative scheme. The insurance industry has a guaranteed market because motorists are required by law to purchase automobile liability insurance. "Although the consumer must buy, the consumer benefits from the knowledge that he cannot be denied coverage without good cause and that coverage may only be terminated prospectively, thus, allowing an opportunity to find alternate insurance. This trade off obviously has shortcomings." *Erie Ins. Exchange v. Lake,* 543 Pa. 363, 374, 671 A.2d 681, 686 (1996).[16]

---

16. As the Supreme Court of Pennsylvania noted, a statute requiring insurance companies to give an insured advance notice of cancellation

> ... is a piece of remedial legislation, the object of remediation being practices of the insurance industry which unfairly disadvantage the average consumer. In attempting to regulate the

industry, the legislature focused upon "the disparate bargaining positions between insurance companies and individuals." One of the primary factors in this disparity of bargaining positions, is the fact that operators of motor vehicles in Pennsylvania are required by law to carry automobile insurance. Thus, the insur-

The insurance company in the instant case made repeated representations to Ms. Conley that automobile liability coverage was binding upon the company on August 15, 2001. The insurance application, the declarations page, the certificate of insurance, and the insurance cards issued by West Virginia National, all indicated that coverage started on August 15, 2001. These representations made to Ms. Conley would be construed by any reasonable, prudent insurance consumer to mean that a policy had been issued and was effective on that date. Furthermore, police officers, the commissioner of motor vehicles, and third parties would also view these representations as evidence of coverage.[17]

 The circuit court therefore did not err when it concluded that the appellant issued or delivered an automobile insurance policy to Ms. Conley on August 15, 2001; that the policy was in effect when the automobile collision occurred on August 31, 2001; and that the attempted cancellation notice on September 11, 2001, was ineffective. "Where there has been an invalid cancellation, the automobile liability insurance policy remains in effect until the end of its term or until a valid cancellation notice is perfected, whichever event first occurs." *Conn v. Motorist Mut. Ins. Co.*, 190 W.Va. 553, 558, 439 S.E.2d 418, 423 (1993) (citation omitted).

The circuit court therefore correctly concluded that because West Virginia National failed to issue a proper notice of cancellation, Ms. Conley's automobile liability insurance policy remained in effect on August 31, 2001, and that West Virginia National was required to provide coverage and a defense for Ms. Conley's accident on that date.

## IV.

### Conclusion

The circuit court's November 22, 2004 summary judgment order is affirmed.

Affirmed.

Chief Justice ALBRIGHT concurs and files a concurring opinion.

Justice MAYNARD dissents and files a dissenting opinion.

ALBRIGHT, C.J., concurring.

(Filed Dec. 16, 2005)

I applaud the majority opinion's scholarship in setting forth the legislative and political history of *W.Va.Code*, 33–6A–1. This law—beyond any question—requires that Ms. Conley have insurance coverage for her accident.

The dissenting opinion's claim that the majority "hing[ed] its decision on a tortured and hyper-technical reading" of the statute is flatly contradicted by the legislative and political history of the statute.

There is a style of opinion writing based on the notion that the surest way to attract attention is to frighten and alarm. "A siren turns more heads than a birdsong does, after all, and that is as it should be, provided the danger is real." Charles Kuralt, *American Moments*, ii (1998). The dissenting opinion

---

ance industry holds a virtual monopoly over the pool of consumers. In this context it is easy to understand why the legislature found it necessary to limit severely the insurance industry's use of the common law remedy of recision, and instead require termination of coverage through only the prospective remedies of cancellation and non-renewal. Obviously, the requirement that all motorists obtain automobile insurance explains why Act 78 sets greater restrictions on the termination of automobile insurance policies[.]

*Erie Ins. Exchange v. Lake*, 543 Pa. 363, 372–73, 671 A.2d 681, 685–86 (1996) (citation omitted).

**17.** Appellant West Virginia National vigorously argued that the appellee is, essentially, trying to get "something for nothing." The appellant con-

tends that the appellee is seeking liability coverage for an accident without paying a penny in premiums, thereby shoving the entire cost of the appellee's negligence onto the backs of innocent, premium-paying insurance consumers.

While the appellant's argument has superficial appeal, it overlooks a significant fact: the appellant has *never* tried to collect the missed premium payment from the appellee. Instead, since learning that the appellee had been involved in a collision for which she was potentially liable, the insurance company's efforts have focused solely upon terminating the policy *in toto* and *ab initio* because of the dishonored premium check. We see nothing in the record to prevent the appellant from pursuing and collecting the missed premium payment from the appellee.

follows this approach. The dissenting opinion says that the majority's writing is the "most outrageous court decision in the history of American jurisprudence," that the majority opinion "unnecessarily obfuscates a straightforward issue," and that the majority gives someone "something for nothing." These claims are poppycock and rubbish, all bark and no bite.

"Let us be very clear about this, dear reader" (to quote from the dissent): the dissenting opinion contains not one shred of law, history or reasoning to support its position. In short the dissent foments public dissatisfaction with the majority view of the case without even a passing nod to legal reasoning or authorities. Great editorial; poor legal scholarship.

Our dissenting colleague neglects to point out that in 1997, he supported precisely the position that he now claims he condemns. In *Bailey v. Kentucky National Ins. Co.*, 201 W.Va. 220, 496 S.E.2d 170 (1997), Justice Davis eloquently concluded that *W.Va.Code*, 33–6A–1(e)(7) mandated that an insurance company give *prospective notice* that it is cancelling an insurance policy. Our dissenting colleague joined in Justice Davis' opinion.

In *Bailey*, law plainly required that the insurance company give thirty days advance notice that it was cancelling. Because the insurance company only gave the policyholder seventeen days of advance notice that it was canceling the policy because the policyholder missed paying a premium, we concluded that the cancellation notice was defective and had no effect. The decision in *Bailey* was unanimous that the insurance company had to follow the law in order to properly cancel a policy. Our dissenting colleague does not—cannot—explain why he has changed his position, and why he thinks that

the insurance company in this case can ignore that very same law.

The dissenting opinion implies that the majority's decision was based on the personal preferences of the other four members of the Court. That implication is false. Our decision is based on a clear reading of a law *passed by the Legislature.*

Since enacting *W.Va.Code*, 33–6A–1(e)(7) in 1982, the Legislature has had *five* opportunities to change this law. The Legislature has had *three* opportunities since the Court issued its interpretation of the law in *Bailey*. The Legislature has never done so. While our dissenting colleague wishes it so, this Court cannot ignore the written law.

The dissenting opinion also fails to note that West Virginia is not alone in enacting *W.Va.Code*, 33–6A–1. While our dissenting colleague—without any support—suggests that West Virginians pay higher insurance rates than people in the five surrounding states because of laws like this, he neglects to point out that those five states have *the same kinds of laws as West Virginia* in this respect.

Forty-eight states, including Ohio, Pennsylvania, Maryland, Virginia and Kentucky, plus the District of Columbia, have statutory schemes just like that found in *W.Va.Code*, 33–6A–1, *et seq.* Almost every state requires an insurance company to give at least 10 days of advance notice to a policyholder before cancelling a policy for failure to pay a premium. Some states, like our neighbors Virginia and Pennsylvania, require 15 days of notice. Even the citizens of Guam are entitled to fifteen days' advance notice of cancellation. Kentucky is unique in requiring fourteen days' notice.[1]

---

1. *See* the laws of Alabama, *Ala.Code*, §§ 27–23–20 to –28 (1971) ("where cancellation is for nonpayment of premium, at least 10 days' notice of cancellation accompanied by the reason therefor shall be given"); Alaska, *Alaska Stat.*, § 21.36.210 to 21.36.310 (1970/1987) ("if cancellation is for nonpayment of premium, the notice shall be mailed to the named insured ... at least 20 days before the effective date of cancellation"); Arizona, *Ariz.Rev.Stat.* §§ 20–1631 to –1634 (1972/1987) ("In motor vehicle insurance policies there shall be a provision that the policyholder is entitled to a minimum grace period of

seven days for the payment of any premium"); Arkansas, *Ark.Code*, § 23–89–301 to –308 (1969) ("when cancellation is for nonpayment of premium, at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given"); California, *Cal. Ins.Code*, §§ 660 to 669 (1968/1984) ("where cancellation is for nonpayment of premium, at least 10 days' notice of cancellation accompanied by the reason therefor shall be given"); Colorado, *Colo.Rev.Stat.* § 10–4–601 to –609 (1969/1990) ("where cancellation is for nonpayment of premium, at least ten days'

notice of cancellation accompanied by the reason therefor shall be given"); Connecticut, *Conn. Stat.*, §§ 38a–341 to –345("(1) where cancellation is for nonpayment of the first premium on a new policy, at least fifteen days' notice of cancellation accompanied by the reason for cancellation shall be given, and (2) where cancellation is for nonpayment of any other premium, at least ten days' notice of cancellation accompanied by the reason for cancellation shall be given."); Delaware, *Del.Code Ann.*, tit. 18 §§ 3903 to 3911 (1959) ("where cancellation is for nonpayment of premium, at least 10 days notice of cancellation accompanied by the reason therefor shall be given"); District of Columbia, *D.C.Code* § 31–2409 (1982) ("in the case of a refusal or failure of the insured to pay a premium due under the terms of the policy, the notice shall be provided to the insured not less than 15 days prior to the effective date of the cancellation"); Florida, *Fla.Stat.* §§ 627.728 to 627.7286 (1982) ("when cancellation is for nonpayment of premium, at least 10 days' notice of cancellation accompanied by the reason therefor shall be given"); Georgia, *Ga. Code Ann.* §§ 33–24–44 to –45 (1960/1987) ("When a policy is canceled for failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums for a policy or any installment of premiums due, ... the notice requirements of this Code section may be satisfied by delivering or mailing written notice to the named insured and any lienholder, where applicable, at least ten days prior to the effective date of cancellation"); Hawaii, *Hawaii Rev. Stat.* §§ 431:10C–111 to –113 (1988/2004)("in the case of cancellation for the nonpayment of premiums the insurer shall: (1) Mail a written notice of prospective cancellation to the insured not fewer than twenty days prior to the effective date of the cancellation; and (2) Continue all motor vehicle insurance and optional additional coverages in force for twenty days following the mailing."); Idaho, *Idaho Code* §§ 41–2506 to –2512 (1969)("where cancellation is for nonpayment of premium at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given"); Illinois, 215 *Ill.Comp.Stat.* 5/143.10 to 5/143.20, 5/143.24 (1979/1982) ("where cancellation is for nonpayment of premium, the notice of cancellation must be mailed at least 10 days before the effective date of the cancellation."); Indiana, *Ind.Code*, §§ 27–7–6–1 to –12 (1969/1985) ("where cancellation is for nonpayment of premium at least ten (10) days notice of cancellation accompanied by the reason therefor shall be given"); Iowa, *Iowa Code*, §§ 515D.1 to 515D.12 (1970) ("where the cancellation is for nonpayment of premium ... at least ten days prior to the date of cancellation"); Kansas, *Kan. Stat. Ann*, §§ 40–276 to –278 (1968/1984); Kentucky, *Ky.Rev.Stat.*, § 304.20–040 (1980/1986)("where cancellation is for nonpayment of premium, at least fourteen (14) days notice of cancellation accompanied by the reason therefor shall be given"); Louisiana, *La.Rev.Stat. Ann.*, §§ 22:636 to 22:636.1 (1958/1987) ("Any policy may be cancelled by the company at any time during the policy period for

failure to pay any premium when due ... by mailing or delivering to the insured written notice stating when, not less than ten days thereafter, such cancellation shall be effective"); Maine, *Me.Rev.Stat. Ann.* tit. 24–A §§ 2911 to 2924 (1973/1983) ("No notice of cancellation of a policy shall be effective unless received by the named insured ... when the cancellation is for nonpayment of premium, at least 10 days prior to the effective date of cancellation"); Maryland, *Md. Ann.Code Ins.* §§ 27–605 to 27–609; *Md. Admin. Code* §§ 31.08.03.01 to 31.08.03.11 (1979/2005) ("At least 10 days before the date an insurer proposes to cancel a policy for nonpayment of premium, the insurer shall cause to be sent to the insured ... a written notice of intention to cancel for nonpayment of premium."); Massachusetts, *Mass. Gen. Laws* ch. 175 §§ 113D, 113F (1971/1983); Michigan, *Mich. Comp. Laws*, §§ 500.2101 to 500.2104, 500.2122 to 500.2124 (1981) ("A notice of termination for nonpayment of premium shall be effective as provided in the policy"); Minnesota, *Minn.Stat.*, §§ 65B.14 to 65B.21 (1967/1984) ("when nonpayment of premium is the reason for cancellation or when the company is exercising its right to cancel insurance which has been in effect for less than 60 days at least ten days' notice of cancellation, and the reasons for the cancellation, shall be given"); Mississippi, *Miss.Code Ann.*, §§ 83–11–1 to –21 (1970) ("where cancellation is for nonpayment of premium at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given"); Missouri, *Mo.Rev.Stat.*, §§ 379.110 to 379.120 (1974); *Mo. Admin. Code* tit. 20 § 500–2.300 (1975/2005) ("When an insurance carrier has certified a motor vehicle liability policy ... the insurance so certified shall not be canceled or terminated until at least ten (10) da@ys after a notice of cancellation or termination of the insurance has been filed with the office of the director of revenue"); Montana, *Mont.Code Ann.*, §§ 33–23–201 to –217 (1967/2003) ("if cancellation is for nonpayment of premium, at least 10 days' notice of cancellation accompanied by the reason must be given"); Nebraska, *Neb.Rev.Stat.*, §§ 44–514 to –521 (1972) ("if cancellation is for nonpayment of premium, at least ten days' notice of cancellation accompanied by the reason therefor shall be given"); Nevada, *Nev.Rev.Stat.* §§ 687B.310 to 687B.400 (1971) ("No cancellation under subsection 1 is effective until in the case of paragraph (a) of subsection 1 ['Failure to pay a premium when due'] at least 10 days ... after the notice is delivered or mailed to the policyholder"); New Hampshire, *N.H.Rev.Stat. Ann.* §§ 417–A:1 to 417–A:10 (1969); *N.H. Admin. Code Ins.* 1401.01 to 1401.09 (1982/1992) ("such effective date may be 10 days from the date of mailing or delivery [of the notice] ... When the policy is being cancelled or not renewed for nonpayment of premium"); New Jersey, *N.J.Rev.Stat.*, §§ 17:29C–1 to –13 (1968/2003) ("where cancellation is for nonpayment of premium at least 15 days' notice of cancellation accompanied by the reason therefor shall be given"); New Mexico, *N.M. Stat. Ann.*,

So the dissenting opinion is completely off the mark in suggesting that West Virginians pay higher insurance premiums than their neighbors because of the ten-day notice requirement in *W.Va.Code*, 33–6A–1(e)(7). The dissenting opinion is also wrong in claiming that the majority opinion is unique in the history of American jurisprudence—unless what the dissenting opinion also meant to say was that the people of West Virginia aren't entitled to the same protection from scurrilous insurance companies as the people of Guam.

Remarkably, the dissenting opinion fails to note that *these laws were written and pushed by the insurance companies themselves*. As the majority opinion makes clear, the insurance industry proposed the passage of these laws to deal with renegade insurers that cancelled insurance policies willy-nilly throughout the 1950s and 1960s. These "bad" insurers took premiums from low-risk customers, but cancelled the policies of customers who were a "risk" because they had an "antagonistic attitude" and questioned an insurance company decision, or because they spoke poor English, were actors or in similar occupations, were nationals of other countries, or lived in neighborhoods that the in-

§ 59A–18–29 (1984) ("The insurer or agent shall give the named insured written notice of such cancellation not less than ten (10) days prior to the effective date of the cancellation."); New York, *N.Y. Ins. Law*, § 3425 (1984/2004) ("Payment to the insurer ... shall be timely, if made within fifteen days after the mailing to the insured of a notice of cancellation for nonpayment of premium"); North Dakota, *N.D. Cent.Code*, §§ 26.1–40–01 to –12 (1985)("When cancellation is for nonpayment of premium, the notice must be mailed or delivered to the named insured at the address shown in the policy at least ten days prior to the effective date of cancellation"); Ohio, *Ohio Rev.Code Ann.*, §§ 3937.30 to 3937.39 (1969) ("Where cancellation is for nonpayment of premium at least ten days notice from the date of mailing of cancellation accompanied by the reason therefore shall be given."); Oregon, *Or. Rev.Stat.*, §§ 742.560 to 742.572 (1971/1975) ("where cancellation is for nonpayment of premium at least 10 days' notice of cancellation accompanied by the reason therefor shall be given"); Pennsylvania, *Pa. Cons.Stat.*, §§ 40 P.S. 991.2001 to 991.2013 (1998) ("When the policy is being cancelled [for non payment of premium] ... the effective date may be fifteen (15) days from the date of mailing or delivery."); Rhode Island, *R.I. Stats.*, 27–29–13 (1994) ("Policyholders shall be entitled to receive no less than thirty (30) days notice before a cancellation of an automobile insurance policy for any reason except nonpayment of premium, in which instance policyholders shall be entitled to receive no less than ten (10) days notice."); South Carolina, *S.C.Code Ann.*, §§ 38–77–30 to 38–77–125 (1988) (A written cancellation notice "must state the date not less than fifteen days after the date of the mailing or delivering on which the cancellation ... becomes effective"); South Dakota, *S.D. Codified Laws Ann.*, §§ 58–11–45 to –55 (1968/2004); Tennessee, *Tenn.Code Ann.*, §§ 56–7–1301 to – 1305 (1968/1981) ("If the cancellation is due to nonpayment ... the policy may be cancelled by the company by mailing to such insured written notice stating when not less than ten (10) days thereafter such cancellation shall be effective"); Texas, *Vernon's Tex.Code Ann.*, §§ 551.051 to

551.055 (1976/1983) ("Not later than the 10th day before the date on which the cancellation of a liability insurance policy takes effect, an insurer must deliver or mail written notice of the cancellation"); Utah, *Utah Code Ann.*, § 31A–21–303 (1986/2004) ("Cancellation for nonpayment of premium is effective no sooner than ten days after delivery or first class mailing of a written notice to the policyholder."); Vermont, *Vt. Stat. Ann.*, Tit. 8 §§ 4222 to 4227 (1972/1977)("where cancellation is for nonpayment of premium at least 15 days' notice of cancellation shall be given"); Virginia, *Va.Code*, §§ 38.2–2212 to – 2213 (1986/1998) ("When the policy is being canceled" because the named insured failed to pay the premium, "the effective date may be less than 45 days but at least 15 days from the date of mailing or delivery" of the cancellation notice); Washington, *Wash. Rev.Code Ann.*, §§ 48.18.291 to 48.18.297 (1985) ("If cancellation is for nonpayment of premium ... at least ten days notice of cancellation, accompanied by the reason therefor, shall be given."); Wisconsin, *Wis. Stat.*, § 631.36 (1975/1981); § 632.35 (1975/1979) ("No cancellation ... is effective until at least 10 days after the 1st class mailing or delivery of a written notice to the policyholder."); Wyoming, *Wy. Stat.*, § 26–35–101 to—204 (If cancellation is for failure to pay a premium when due, notice must be given "Not less than ten (10) days prior to the proposed effective date of cancellation"). *See also* Guam, *Guam Code Ann.*, Title 16, §§ 21101 to 21110 (1968) (when a policy is cancelled for nonpayment of premium, a cancellation notice must state a cancellation date at least "fifteen (15) days from the date of mailing or delivery").

It appears that only North Carolina and Oklahoma do not require advance notice of the cancellation of automobile insurance policies (however, an Oklahoma statute, 36 Okl.St.Ann. § 3639, states that for "commercial property insurance policies, commercial casualty insurance policies, and commercial fire insurance policies" at least ten days' notice of cancellation must be given to the insured for nonpayment of premium).

surance company decided were "going downhill."

Let me say it again: *these laws were written at the request of good insurance companies to regulate bad insurance companies.* This is not, as our dissenting colleague might suggest, a wacky scheme that only exists in West Virginia. Nationwide, honest insurance companies wanted to regain the public's trust, and therefore encouraged the passage of laws like *W.Va.Code,* 33–6A–1 to rein in all insurance companies, and to make them all compete on an even, fair playing field.

There is nothing new under the sun, and what the insurance company did in this case was common when *W.Va.Code,* 33–6A–1 was first enacted in 1967. For over one hundred years it has been the routine for insurance companies to issue insurance to a customer on-the-spot, the day an application was completed. That way the customer would not walk down the street to the next insurance broker.

But the routine used to be that if an insured event occurred—a fire, a death, a car accident—the insurance company would cancel the policy and tell the customer "sorry, we rejected your application." The passage of *W.Va.Code,* 33–6A–1 was supposed to eliminate these kinds of cancellations. This case is nothing more than a twist on that centuries-old "hide the peanut" scheme.

In this case, Ms. Conley applied for insurance on August 15th, and the insurance company told her, that day, that she had coverage. Fifteen days later, on August 30th, it sent her a certificate of insurance, two proof of insurance cards, and a declarations page showing she had coverage. The next day she had an accident. A week-and-a-half later, the insurance company announced it was cancelling the policy, because the insurance company had decided that there never was a policy to begin with.

The insurance company argued this was a "something for nothing" case because Ms. Conley's check was returned by the bank for insufficient funds. The dissenting opinion suggests (without any proof) that Ms. Conley deliberately bounced a check. The problem with this argument is obvious: the insurance company has never, in the four years since the accident, asked Ms. Conley to make good on her check. If the company had sold her a television set, it wouldn't be here in court demanding the television set back. The company would be demanding that Ms. Conley pay for the goods.

But insurance isn't a consumer good you can wrap your fingers around. The insurance company would have us believe that even though Ms. Conley had scraps of paper in her hands telling her she had coverage, she didn't really have anything. Twenty-seven days after telling Ms. Conley she was walking out of her insurance agent's office with coverage, the appellant insurance company was faced with a choice: either demand that Ms. Conley make good on her $174.00 check and pay out up to $40,000.00 in bodily injury insurance coverage and $10,000.00 for property damage, or claim that there never was an insurance policy to begin with. For the insurance company, the answer was easy. It "cancelled" the policy, and attempted to make the cancellation retroactive to a date that preceded the insured event.

The dissenting opinion fails to note that the National Association of Insurance Commissioners has taken a stand against this kind of insurance company conduct. The NAIC has proposed a model law that mandates that insurance companies give customers ten days of prospective notice that their policies are being cancelled for nonpayment of premiums. The model law states:

> No insurer shall cancel an automobile insurance policy unless . . . when cancellation is for nonpayment of premium, notice shall be mailed or delivered to the named insured at the last known mailing address as shown in the records of the insurer at least ten (10) days prior to the effective date of cancellation.

National Association of Insurance Commissioners, "NAIC Automobile Insurance Declination, Termination and Disclosure Model Act," IV *Model Laws, Regulations and Guidelines* 725–1 to–16 (1997). The West Virginia Legislature, in *W.Va.Code,* 33–6A–1, has mirrored this model law.

Finally, the dissenting opinion ignores the public policy considerations behind the Leg-

islature's decision to enact these notice of cancellation laws. These laws give the policyholder advance notice the policy is being cancelled *so the policyholder can correct any mistakes or pay a missed premium.* This is important because a policyholder will often be denied coverage from another insurer, or at least have to pay higher premiums, when a policy is cancelled—regardless of whether the reason for cancellation was valid. It also gives the policyholder a chance to buy insurance from another company before the policy is canceled. These laws protect not only the policyholder, but also innocent citizens who might be injured by the policyholder—like the three people who claim they were injured by Ms. Conley's negligence.[2]

The scholarly majority opinion firmly established that the law required Ms. Conley get ten days of advance notice that her policy was being cancelled. The insurance company completely ignored this law, gave her retroactive notice, and gambled that it wouldn't have to pay anything under the policy. The circuit court and the majority opinion properly found that the insurance company was wrong.

I therefore respectfully concur, and I deeply regret the dissent in this case—an opinion without supporting law, history or any legal reasoning.

MAYNARD, Justice, dissenting.

The majority opinion should hereafter be known as the "something for nothing case" because it holds that the Appellee must be provided with insurance coverage even though she paid absolutely nothing for the coverage. As such, the majority opinion has to be one of the most outrageous court decisions in the history of American jurisprudence ranking right up there with the McDonald's scalding case, the BMW bad paint job case, the Benson truck bed cocaine supervisor case, and the O.J. Simpson criminal verdict.

Let us be very clear about this, dear reader. The Appellee has paid NOTHING for this insurance. Absolutely nothing! Zero!

Not one red cent! It really is a something for nothing case.

Of course, something for nothing cases are not entirely unusual in West Virginia where plaintiffs regularly contend that someone, somewhere, somehow must owe them money simply because they have suffered an injury. In fact, in this State, people can get money even when they are not injured but merely fear the possibility that they may be injured sometime in the future. *See Bower v. Westinghouse Elec. Corp.,* 206 W.Va. 133, 522 S.E.2d 424 (1999) (creating a cause of action for medical monitoring). Thus, this preposterous decision should not come as a complete surprise to anyone.

The facts below show that this is really a simple contract case. The application for insurance signed by the Appellee expressly stated that, "I also agree that if my premium remittance is not honored by the bank no coverage will be bound." Therefore, because the Appellee wrote a bad check and her premium remittance was not honored by the bank, per the clear language of the application, no coverage exists for her accident. Clearly, the Appellee's payment of a premium was the consideration necessary for the formation of the insurance contract. Since the Appellee never provided any consideration, because her check was worthless, no insurance contract was ever formed. Hence, there is no coverage. It is really that simple. In hinging its decision on a tortured and hyper-technical reading of W.Va.Code § 33–6A–1(e)(7), however, the majority opinion unnecessarily obfuscates a straightforward issue and thereby misses the big picture—the Appellee is receiving insurance coverage for which she never paid one red cent.

The average working West Virginian who regularly struggles to pay his or her auto insurance premiums should take note of the majority opinion because West Virginians pay higher auto insurance rates than people in the five surrounding states. When insurance companies are compelled by law to provide coverage *non gratis* to some people,

2. Actually, Ms. Conley is not being sued by the three people she supposedly injured. She is being sued by their insurer, Dairyland Insurance Company. So the innocent party receiving protection under the majority's opinion is another insurance company.

they are naturally forced to make up the loss by charging higher premiums to those folks who actually pay for their insurance coverage.

The majority had to work hard to write an opinion that actually does everything that the law should not do. It punishes the innocent by causing honest, hard-working West Virginians to pay higher auto insurance premiums. At the same time, it rewards the guilty by providing a windfall to those who never paid for insurance coverage. Finally, it encourages future dishonest conduct by holding that people can procure insurance coverage by tendering worthless premium checks to insurers.

Because I do not believe that people should, by their own dishonest conduct, receive something for nothing to the detriment of honest people, I strongly dissent to the majority opinion.