517 S.E.2d 313

Richard M. RIFFE and Brenda J. (Hoit) Riffe, Plaintiffs Below, Appellants,

v.

HOME FINDERS ASSOCIATES, INC., a West Virginia Corporation; Joe Nekoranec, an Individual, Defendants Below,

Home Security of America, Inc., a Wisconsin Corporation; Marshall E. Snyder, an Individual; Judith A. Snyder, an Individual; Teresa Ann Snyder Rogers, an Individual; Jeff Snyder, an Individual; Pamela Lynn Snyder Cruikshank, an Individual; National Property Inspections of West Virginia, Inc., a West Virginia Corporation; John R. Knight, an Individual; and Jeffrey L. Marino, an Individual, Defendants Below, Appellees.

No. 25178.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 17, 1999.

Decided June 25, 1999.

Rosalee Juba–Plumley, Esquire, Eleanor, West Virginia, Attorney for Appellants.

Phillip B. Hereford, Esquire, Hereford & Hereford, Charleston, West Virginia, Attorney for Appellee Home Security of America, Inc.

Debra L. Hamilton, Esquire, DiTrapano, Barrett & DiPiero, Charleston, West Virginia, Attorney for Appellees Snyders, Rogers and Cruikshank.

McGRAW, Justice:

Appellants and plaintiffs below, Richard and Brenda Riffe (the "Riffes") appeal a grant of summary judgment against them and in favor of appellee and defendant below, Home Security of America, Inc.,[1] in an action the Riffes filed claiming fraud, insurance bad faith, and breach of contract. Because we find that genuine issues of material fact existed as to these issues, we reverse the trial court's grant of summary judgment and remand this case for proceedings consistent with this opinion.

---

1. We consider in this opinion the grant of summary judgment in favor of Home Security of America, Inc. Although the other defendants listed in the style as appellees are still parties to this case, we shall use the term appellee only in reference to Home Security of America, Inc.

## I.

### Factual Background

The Snyder family owned a house in South Charleston and decided to sell it. The Snyders listed the house for sale with a realty company, but received no offers. A member of the Snyder family made the acquaintance of a Mr. Joe Nekoranec, who worked as a real-estate agent for a Charleston based realty company called Home Finders Associates, which was affiliated with a national real estate company called Better Homes and Gardens Real Estate Service. The Snyders subsequently engaged Mr. Nekoranec to sell their home in August of 1989.

On April 6, 1988, Home Finders Associates, Inc. ("Home Finders") had entered into an agreement with Home Security of America, Inc. ("Home Security"), whereby the real estate agents employed by Home Finders would offer for sale a product called "The Home Security Plan," or "The Home Protection Plan[2]," to the sellers and buyers of homes sold through the real estate company. This plan was a so-called "home warranty contract" that purported to indemnify the homeowner for any repairs that might be necessary *after* a seller sold a home to a buyer. That is, under the "home warranty contract," Home Security would not pay for a repair to a seller's furnace if the house were not sold, but it would pay for a repair to the same furnace if the repair became necessary within a certain period after someone bought the home. The plan claimed to cover repairs to the home itself, as well as to certain items of personal property located on the property.

As a part of the agreement between Home Finders and Home Security, Home Security agreed to provide, free of charge, contracts and promotional materials for the plan. These promotional materials made claims that a seller could sell his or her house sooner and for more money if the house were covered by the plan.

---

2. The agreement between Home Finders Associates, Inc. and Home Security of America, Inc., refers to "The Home Security Plan." Included as a deposition exhibit is a brochure entitled "Home Protection Plan." We shall refer to the policy simply as "the plan."

Mr. Nekoranec visited the Snyder's home and made a visual inspection of it as part of the preparations for listing the house for sale. In the course of these preparations, Mr. Snyder asked Mr. Nekoranec if there were some sort of insurance he could purchase that would cover any repairs the home might need. It appears that Mr. Snyder was concerned that he might be responsible for making repairs to the house for some period of time after selling it to a third party.[3]

In response to this question, Mr. Nekoranec presented a brochure provided by Home Security and suggested that Mr. Snyder apply for the plan.[4] Mr. Nekoranec then helped the Snyders fill out an application that was attached to the brochure.[5] No fee was due to Home Security until the house sold.

The Riffes entered into a contract with the Snyders to purchase the home in the fall of 1990. Before the closing date, the Riffes had a company called National Property Inspections examine the property. In its report, the inspection company found some minor cracks and some evidence of settling, but no major problems with the foundation.

The Riffes closed on the house on November 19, 1990. At closing, the Snyders' side of the closing statement was debited $395 for the "home warranty contract," which was to benefit the Riffes in the event something went wrong with the house during the first year of their ownership. Within that first year, the Riffes had a plumber in to repair a leak in the basement. Making this repair necessitated the removal of some drywall, whereupon the Riffes discovered a serious problem with their foundation.

The Riffes made a claim for the damage to the basement with Home Security, but Home Security denied the claim, stating that the problem with the foundation was a pre-existing condition, and was therefore excluded under the terms of the policy. The Riffes filed an insurance bad faith and breach of contract suit against Home Security, among others, in July of 1992. On November 17, 1997, the trial judge granted Home Security's motion for summary judgment. It is from this grant of summary judgment for the defendant that the Riffes appeal to this Court. For reasons set forth below, we reverse.

## II.

### Standard of Review

■ Our review of a grant of summary judgment is *de novo*. Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). The burden a movant must carry to win a motion for summary judgment is manifest: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

---

3. In his deposition testimony, Mr. Snyder stated "As far as I can remember, I said something like, 'Do you have some kind of insurance policy, or know where I can get one?' And he said he could get me one through his real estate company." When then asked why he thought he needed such a policy, Mr. Snyder replied, "Because I was moving out of state, up to Alaska, and there was no way I could have come down here and fixed stuff, or made arrangements to fix stuff."

4. Mr. Snyder's deposition testimony indicates that Mr. Nekoranec never presented to him the ten to twelve page booklet outlining all of the policy terms, which is a part of the record, but that he was shown something more in the nature of a brochure.

5. During his deposition in 1993, Mr. Nekoranec identified an exhibit as being substantially simi-

lar to the brochure he presented to Mr. Snyder. It is unclear from the record exactly what language was contained in the brochure that Mr. Snyder examined in 1989. However, the exhibit identified by Mr. Nekoranec contained, in capital letters, the following language:

"SELL OR PURCHASE A HOME WITH CONFIDENCE AND PEACE OF MIND WITH THE HOME PROTECTION PLAN, THE HOME WARRANTY OFFERED BY MEMBERS OF BETTER HOMES AND GARDENS® REAL ESTATE SERVICE AND ADMINISTERED BY HOME SECURITY OF AMERICA. PROVIDE YOURSELF WITH PROTECTION AGAINST THE COSTS OF REPAIRING OR REPLACING MECHANICAL AND STRUCTURAL SYSTEMS IN YOUR HOME WHICH [sic] BECOME DEFECTIVE DUE TO NORMAL WEAR AND TEAR."

In the case before us, we must examine the parties' rights and obligations under a contract of insurance. In this arena our review is also *de novo:* "Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." *Murray v. State Farm Fire and Cas. Co.,* 203 W.Va. 477, 482, 509 S.E.2d 1, 6 (1998) (*citing Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 760 (3d Cir.1985)). The interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal. *See, Payne v. Weston,* 195 W.Va. 502, 506–07, 466 S.E.2d 161, 165–66 (1995); *Murray v. State Farm Fire and Cas. Co.,* 203 W.Va. 477, 482, 509 S.E.2d 1, 6 (1998).

### III.

#### Discussion

Chapter Thirty–Three, Article One of our Code states: "Insurance is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies." W. Va.Code § 33–1–1 (1957). *See, McDaniel v. Kleiss,* 202 W.Va. 272, 503 S.E.2d 840 (1998). The same article provides: "Transacting insurance includes solicitation and inducement, preliminary negotiations, effecting a contract of insurance and transaction of matters subsequent to effecting the contract and arising out of it." W. Va.Code § 33–1–4 (1957).

Specifically, this case concerns what some have called a "service contract,"[6] which may be used as a catch-all term for arrangements where a third-party, who is neither the buyer or seller of property, contracts with the buyer to indemnify him or her for repairs made to the property for a certain period of time after a sale.

Home Security maintains that the "service contract" it offers is a warranty and is not insurance, and that the company is not engaged in the business of selling insurance in the State of West Virginia. We do not agree. Under the plan, a homeowner would file a claim, have the repair made, and would be indemnified by home security for the cost of a covered repair, minus any deductible. There can be no question that the contract offered by Home Security "is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies." W. Va.Code § 33–1–1 (1957).

The agreement provided by Home Security, although it claims to offer "warranty coverage" is an insurance policy. "Policy means the contract effecting insurance, or the certificate thereof, *by whatever name called,* and includes all clauses, riders, endorsements and papers attached thereto and a part thereof." W. Va.Code § 33–1–16 (1957) (*emphasis added).*

An Illinois appellate court considered a similar issue in *Griffin Systems, Inc. v. Washburn,* 153 Ill.App.3d 113, 106 Ill.Dec. 330, 505 N.E.2d 1121 (1987). In this case, Griffin Systems, Inc., provided a third-party agreement that would indemnify a car buyer for the repair or replacement of certain automotive parts. The court discussed service contracts, such as those provided by a car manufacturer to perform free service upon a new car for a specific period of time,[7] as well as traditional warranties, such as those provided by a roof manufacturer that agrees to repair or replace a roof it constructed.[8]

In holding that the Griffin Systems agreement constituted insurance under Illinois law, the court explained:

An analysis of the cases set forth above reveals that a warranty and a service contract have many of the same features. Nonetheless, the distinguishing feature which sets them apart from an insurance policy is the fact that the respective com-

---

**6.** Kenneth E. Spahn, Service Warranty Associations: Regulating Service Contracts as "Insurance" Under Florida's Chapter 634, 25 Stetson L.Rev. 597.

**7.** *Rayos v. Chrysler Credit Corp.,* 683 S.W.2d 546 (Tex.App.1985).

**8.** *GAF Corp. v. County School Board of Washington County, Virginia,* 629 F.2d 981 (4th Cir. 1980).

panies *manufacture or sell the products which they agreed to repair or replace.* No third parties are involved nor is there a risk accepted which the company, because of its expertise, is unaware of. Through a warranty or service contract, a company simply guarantees that its own product will perform adequately for a period of time.

Insurance policies, on the other hand, are generally issued by third parties and are based on a theory of distributing a particular risk among many customers.

*Griffin Systems, Inc. v. Washburn*, 153 Ill. App.3d 113, 106 Ill.Dec. 330, 505 N.E.2d 1121, 1124 (1987). We concur with the Illinois Court.[9] A so-called, third party "warranty" contract, in which a third party, who is not the manufacturer or seller of goods or property, agrees to indemnify a buyer for a defect in the goods or property sold, is indeed, "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies," and is therefore an insurance contract under the laws of the State of West Virginia.[10]

■ Because the policy offered by Home Security is insurance, the Riffes are entitled to all the protections afforded to purchasers of insurance under our law. We have long held that, "[i]t is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syl. pt. 4, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). Furthermore, "[w]henever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syllabus point 1, *Prete v. Mer-*

chants *Property Ins. Co. of Indiana*, 159 W.Va. 508, 223 S.E.2d 441 (1976); Syl. pt. 2, *Murray v. State Farm Fire and Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1 (1998).

■ Intertwined with the notion of ambiguity is the "doctrine of reasonable expectations:"

With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

Syl. pt. 9, *Murray v. State Farm Fire and Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1 (1998) (*quoting*, Syl. pt. 8, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987)). We also have held that, "[a]n insurance contract should be given a construction which a reasonable person standing in the shoes of the insured would expect the language to mean." *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 741, 356 S.E.2d 488, 495 (1987), (*quoting*, *Soliva v. Shand, Morahan & Co.*, 176 W.Va. 430, 433, 345 S.E.2d 33, 35–36 (1986)). We also noted in *Soliva*, that "[a] policy should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties. *Soliva v. Shand, Morahan & Co.*, 176 W.Va. 430, 432, 345 S.E.2d 33, 35 (1986).

Although we limit the application of this doctrine, "[i]n West Virginia, the doctrine of reasonable expectations is limited to those instances, such as the present case, in which the policy language is ambiguous[,]" *National Mut. Ins. Co. v. McMahon & Sons, Inc.*,

**9.** We note that the Supreme Court of Ohio came to a different conclusion in *Griffin Systems v. Ohio Department of Insurance*, 61 Ohio St.3d 552, 575 N.E.2d 803 (1991), by employing what it called the "substance of the contract test." We respectfully decline to follow the logic of the Ohio Court.

**10.** Florida has implemented a statutory scheme for dealing with companies that sell third-party "service contracts." Applying language identical to that set out in W. Va.Code 33–1–1 (1957), and 33–1–16 (1957), the Florida legislature created

three categories of "warranty associations." Any company offering to indemnify home buyers for defects in construction or included appliances is considered a "Home Warranty Association," and must deposit a substantial sum with the Florida Department of Insurance and may only sell its plans through licensed insurance agents. Fla. Stat. § 634 *et seq.* *See also*, Kenneth E. Spahn, Service Warranty Associations: Regulating Service Contracts as "Insurance" Under Florida's Chapter 634, 25 Stetson L.Rev. 597.

**222**

177 W.Va. 734, 742, 356 S.E.2d 488, 496 (1987). We have also noted that, "[w]here ambiguous policy provisions would largely nullify the purpose of indemnifying the insured, the application of those provisions will be severely restricted." *Id.* quoting, *Linden Motor Freight Co. v. Travelers Insurance Co.*, 40 N.J. 511, 193 A.2d 217 (1963)).

■ Additionally, we scrutinize more carefully any policy language that has the effect of excluding an insured from coverage. "[W]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 740, 356 S.E.2d 488, 494 (1987) (*quoting, Pan American World Airways, Inc. v. Aetna Casualty and Surety Co.*, 505 F.2d 989 (2d Cir.1974); *Prickett v. Royal Insurance Co.*, 56 Cal.2d 234, 14 Cal.Rptr. 675, 363 P.2d 907 (1961); *Del Vecchio v. Old Reliable Fire Insurance Co.*, 132 N.J.Super. 589, 334 A.2d 394 (1975); *St. Paul Fire and Marine Insurance Co. v. S.L. Nusbaum and Co.*, 227 Va. 407, 316 S.E.2d 734 (1984))..

■ It is not entirely clear from the record what policy language the Snyders or the Riffes saw before the plan was purchased. The language in the more detailed version of the plan eventually provided by Home Security attempts to exclude coverage for "pre-existing conditions." Among other exclusions and limitations, the plan also states that it will not cover damage due to:

> Fire, lightning, wind, windstorm, hail, sleet, snow, ice or water back-up due to ice, explosion, riot, civil commotion, aircraft, vehicles, smoke, vandalism, malicious mischief, glass breakage, theft, burglary, falling objects, weight of ice and/or snow, discharge of water or steam (from plumbing, heating, air conditioning systems or appliances), war or any act of aggression, acts of God, accident, nuclear contamination, flood, surface water, waves or tidal waves, earthquake, landslide, mud flow, seepage, corrosion, rust, rot, dry rot, condensation, power failure or shortage, destruction caused by rodents, termites, insects and vermin, or any cause other than an operational failure to a covered part or

component. Pre-existing conditions when the covered item was not in proper working order on the date of application for the Sellers' coverage or on the date of closing for the buyers coverage or when an operational failure is due to a pre-existing condition.

Logic would dictate that a problem with the wall must either be caused by some outside force, all excluded by the policy, or must have existed since the beginning of time, and, as a pre-existing condition, is also excluded by the policy. This paradox was provided by Home Security for the very reasonable price of $395.

■ Clearly, this is not what a reasonable person standing in the shoes of Mr. and Mrs. Riffe would have expected the language of their policy to mean. Moreover, as this language "would largely nullify the purpose of indemnifying the insured" its application must be "severely restricted." *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 742, 356 S.E.2d 488, 496 (1987) (*quoting, Linden Motor Freight Co. v. Travelers Insurance Co.*, 40 N.J. 511, 193 A.2d 217 (1963)). Because the language tends to exclude an insured from coverage, it must be, "strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." *Id.* Because an issue of material fact exists as to what language was presented to the parties before initiating the contract, the trial court's grant of summary judgment was inappropriate.

An additional safeguard afforded a purchaser of insurance in West Virginia is protection from conflicts between promotional materials and an insurance policy. We considered such an issue in a case involving a group insurance policy, wherein, an insurance agent had provided promotional materials that were in conflict with the master policy. In, *Romano v. New England Mut. Life Ins. Co.*, 178 W.Va. 523, 362 S.E.2d 334 (1987), we held: "Where an insurer provides sales or promotional materials to an insured under a group insurance policy, which the insurer knows or should know will be relied upon by the insured, any conflict between such materials and the master policy will be

resolved in favor of the insured." *Id.,* Syl. pt. 3.

We also observed that "[o]bviously, the very purpose of the materials was to induce Creasey customers to participate in the plan and their employees to enroll as insureds. Where advertisements, sales brochures, or similar materials are provided as an inducement to insureds, cases uniformly hold that insurers are bound by the provisions contained therein." *Id.* at 528, 362 S.E.2d at 339.

 We feel this principle is applicable to the case at hand, and hold that, where an insurer provides sales or promotional materials to an insured as an inducement to enter into an insurance policy, which the insurer knows or should know will be relied upon by the insured, any conflict between such materials and the insurance policy will be resolved in the insured's favor.

Because these considerations of ambiguity, reasonable expectations, exclusionary language, and conflicts with promotional materials may determine the rights of the parties under the contract, genuine issues of material fact exist, and summary judgment is inapposite.

 Finally, defendant Home Security argues that Mr. Nekoranec was not acting as an agent for Home Security when he sold the plan to the Snyders, or when he discussed the features of the plan with the Riffes. We are not persuaded by this argument.

The legislature established that, "[a]ny person who shall solicit within this State an application for insurance shall, in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of such insurer and not the agent of the insured." W. Va.Code § 33–12–23 (1957). We have confirmed this view: "It is obvious from the clear and unambiguous language of the stat-

ute that the solicitor of the application for insurance should be regarded for all purposes as the agent of the insurer in any controversy between it and the insured or his beneficiary." *Smithson v. United States Fidelity & Guar. Co.,* 186 W.Va. 195, 204, 411 S.E.2d 850, 859 (1991) (*quoting, Knapp v. Independence Life & Accident Insurance Co.,* 146 W.Va. 163, 169, 118 S.E.2d 631, 635 (1961)). *See also, Warden v. Bank of Mingo,* 176 W.Va. 60, 341 S.E.2d 679 (1985) (holding that a bank selling credit life insurance policies to its debtor customers was acting as the agent for the insurance company that wrote the policies).

Mr. Nekoranec did "solicit, negotiate, and effect" the agreement between the Snyders and Home Security, and in so doing acted as the agent for home security. Therefore, statements and representations he made to the Snyders and to Riffes must be regarded as disputed issues of material fact, again demonstrating that the grant of summary judgement must be reversed.

## IV.

### *Conclusion*

Because we find that the "home warranty contract" offered by Home Security is insurance, and because we find that Mr. Nekoranec acted as Home Security's agent when he sold the policy to the Snyders and discussed the policy with the Riffes, we reverse the trial court's grant of summary judgment for the defendant and remand this case for additional proceedings consistent with this opinion.

Reversed and remanded.