# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-1134

_____

FILED

**March 11, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. SAFE-GUARD
PRODUCTS INTERNATIONAL, LLC,
Petitioner

V.

THE HONORABLE MIKI THOMPSON,
JUDGE OF THE CIRCUIT COURT OF MINGO COUNTY,
AND ROBIN L. HINKLE,
Respondents

_____

ORIGINAL PROCEEDING IN PROHIBITION

WRIT DENIED

_____

Submitted: February 24, 2015
Filed: March 11, 2015

James A. Varner, Sr.
Debra Tedeschi Varner
Jeffrey D. Van Volkenburg
McNeer, Highland, McMunn and Varner, L.C.
Clarksburg, West Virginia
Attorneys for Petitioner

Honorable Miki Thompson
Judge, 30th Judicial Circuit
Williamson, West Virginia
Respondent

Howard M. Persinger, III
Persinger & Persinger, L.C.
Charleston, West Virginia
Attorney for the Respondent,
Robin L. Hinkle

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight."  Syllabus point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).


2.      A debt cancellation contract is not considered insurance, if it is directly provided by a lending institution to the purchaser of a product.  On the other hand, a contract that requires a third party to indemnify a lender, as a result of a specified event that causes the lender not to be repaid by a borrower, is not a debt cancellation contract.  The latter type

i

of contract is an insurance contract that is governed by the insurance laws of the State of

West Virginia.

**Davis, Justice:**

This case was brought under the original jurisdiction of this Court by Safe-Guard Products International, LLC ("Safe-Guard") seeking a writ of prohibition to prevent enforcement of a partial summary judgment order by the Circuit Court of Mingo County. The circuit court's order determined that GAP[1] Insurance coverage issued by Safe-Guard was insurance for purposes of the litigation against it that was brought by Robin Hinkle ("Ms. Hinkle"). In this proceeding, Safe-Guard contends that the GAP Insurance coverage it extended to Ms. Hinkle was not insurance. Upon our review of the parties' briefs, oral arguments, the appendix records designated for our consideration, and the pertinent authorities, we deny the writ.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The pertinent facts of this case show that on July 14, 2006, Ms. Hinkle and her former husband, Johnny Hinkle (collectively "the Hinkles"), purchased a 2006 Monte Carlo from C&O Motors, a dealership in St. Albans, West Virginia. The purchase price of the vehicle was $20,552.70. The Hinkles made a modest down payment on the vehicle and financed $19,718.20. The salesman for the dealership asked the Hinkles if they wanted to purchase GAP Insurance. The Hinkles were told that the GAP Insurance would relieve them

---

[1]"GAP" stands for Guaranteed Asset Protection Plan.

of payment owed on the vehicle if it was declared a total loss as a result of an accident, and more was owed for the vehicle than the value assigned to it at the time it was totaled. The Hinkles agreed to purchase the GAP Insurance at a cost of $495.[2] Although the salesman for the dealership provided the Hinkles with the GAP Insurance, it was done on behalf of Safe-Guard.

On June 1, 2011, Ms. Hinkle was involved in an automobile accident. The accident resulted in her vehicle being declared a total loss by her insurer State Farm. Ms. Hinkle's insurer paid $7,285.00, as the actual cash value of the car, to the vehicle's finance note holder, Santander Consumer, USA.[3] After payment was made to the note holder, Ms. Hinkle was left owing Santander approximately $4,698.81 on the purchase price of the vehicle. In order to pay off the balance owed on the vehicle, Ms. Hinkle contacted Safe-Guard and submitted a claim to cover the balance owed on the vehicle under the GAP Insurance she had purchased. Safe-Guard denied coverage, allegedly on the grounds of prior delinquent payments on the vehicle, deferred payments, and late charges Ms. Hinkle incurred during the life of the loan.

Subsequent to Safe-Guard's denial of coverage, Ms. Hinkle filed this action

---

[2]The sales agreement listed the coverage as GAP Insurance.

[3]The original financing institution on the loan for the vehicle, City Financial Auto Credit, assigned its rights under the purchase agreement to Santander.

against Safe-Guard.[4]  The complaint alleged causes of action for breach of contract and statutory and common law bad faith.  After a period of discovery, Ms. Hinkle filed a motion for partial summary judgment on the narrow issue of whether the GAP Insurance provided by Safe-Guard constituted insurance under the laws of West Virginia.  The circuit court found that the GAP Insurance was, in fact, insurance.  Safe-Guard thereafter initiated the instant proceeding seeking a writ of prohibition to preclude enforcement of the partial summary judgment order.

## II.

## STANDARD OF REVIEW

Our standard of review for determining whether to issue a writ of prohibition has been formulated as follows:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important

---

[4]Other defendants were named in the suit. The other defendants and the claims against them are not part of this proceeding.

3

problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

## III.

## DISCUSSION

As a preliminary matter, Ms. Hinkle contends that this Court should not entertain the petition filed in this case because Safe-Guard cannot satisfy any of the *Berger* factors.[5] We disagree. The issue raised by the circuit court's order satisfies the fifth factor under *Berger*. That is, the issue raised by Safe-Guard presents an important issue of law of first impression. Consequently, we will examine the merits of the petition.

The first argument Safe-Guard makes is that the GAP Insurance is a debt cancellation contract. Therefore, it does not come within the definition of insurance under W. Va. Code § 33-1-1 (1957) (Repl. Vol. 2011). We note that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W. Va.

_____

[5]We will acknowledge that the trial judge in the case, the Honorable Judge Miki Thompson, filed a separate response opposing Safe-Guard's petition.

877, 65 S.E.2d 488 (1951).  Under the statute, "insurance" is defined as follows:

> Insurance is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies.

Under the facts of this case, we find no ambiguity in the statute.

Safe-Guard contends that the GAP Insurance is not insurance because there is no third-party indemnification to the automobile purchaser.[6]  In other words, Safe-Guard interprets the statute as requiring indemnification only to the purchaser.  Safe-Guards cites to this Court's decision in *Riffe v. Home Finders Associates, Inc.*, 205 W. Va. 216, 517 S.E.2d 313 (1999), to support this argument.  *Riffe* does not support the proposition that, in order for a policy to be considered insurance under W. Va. Code § 33-1-1, it can only indemnify the purchaser.  In *Riffe*, we held that a "warranty contract" was insurance under the statute.  Nothing in *Riffe* limits indemnification under the statute to only purchasers of insurance policies.

Dispositive guidance as to whether a debt cancellation contract is, in fact, insurance is found in a document published by the Insurance Commissioner in September

---

[6]In making this argument, Safe-Guard indicates in a footnote that in "very limited, unique circumstances a debtor/purchaser may be paid the value of the deficiency in the automobile loan."

2009, and entitled West Virginia Informational Letter No. 171.[7]  The Informational Letter

was sent to all insurance companies licensed to do business in West Virginia.  The

Informational Letter stated its purpose as follows:

> The Offices of the Insurance Commissioner ("OIC") routinely receives questions concerning whether debt cancellation contracts or debt suspension agreements are regulated as insurance.  In order to provide practical and useful guidance to the insurance industry and to the public at large, this Informational Letter is intended to distinguish between debt cancellation contracts and debt suspension agreements.

The Informational Letter sets out the definition of a debt cancellation contract and a debt

suspension agreement as defined by the United States Department of the Treasury.  After

setting out those definitions, the Informational Letter applies those definitions to reach the

following conclusion:

> In order to fall outside OIC regulation, the cancellation or waiver of the debt must be directly provided by the lender.  A contract in which a third party is obligated to indemnify the lender – as a result of a specified event that causes the lender to not be repaid by the borrower – is not a debt cancellation contract or debt suspension agreement.  This type of contract is an insurance transaction and is subject to the insurance laws of the State of West Virginia.  A third party includes, but is not limited to, a subsidiary or affiliated company of the lender.

In accordance with the Informational Letter, we now hold that a debt cancellation contract

is not considered insurance, if it is directly provided by a lending institution to the purchaser

---

[7]*See* www.wvinsuranceco.gov/Portals/0/pdf/pol_leg/info_letters/info_171.pdf .

of a product.[8]  On the other hand, a contract that requires a third party to indemnify a lender, as a result of a specified event that causes the lender not to be repaid by a borrower, is not a debt cancellation contract.  The latter type of contract is an insurance contract that is governed by the insurance laws of the State of West Virginia.

The Informational Letter and our holding are consistent with decisions from other jurisdictions confronting similar debt cancellation agreements.  For example, in *Embry v. Innovative Aftermarket Systems L.P.*, 198 P.3d 388 (Okla. 2008), the plaintiff purchased a vehicle.  At the time of the purchase, the dealer also sold the plaintiff a "Debt Relief Waiver Addendum (DRWA)."  The dealer marketed the DRWA on behalf of a company called Aftermarket Systems, Inc. ("IAS").  The purpose of the DRWA was to provide

> protection of the debtor against owing a deficiency in the event the financed vehicle is totally destroyed or stolen, and not recovered, and the debtor's insurance does not pay the entire balance due on the financing contract because the fair market value of the car, the insured value, is less than the balance due.

*Embry*, 198 P.3d at 389.  The DRWA contained a statement that it was not an offer of insurance nor was it an insurance policy.  The plaintiff's vehicle was in an accident and was

_____

[8]During oral arguments, counsel for Ms. Hinkle argued that the Insurance Commissioner also issued an Informational Letter in 2008, which purported to set out another  test for determining whether a debt cancellation agreement was insurance.  The purported 2008 Informational Letter was not set out in the brief of either party, nor was it addressed in the circuit court's partial summary judgment order.  Consequently, we will not address the issue of the purported 2008 Informational Letter.

7

declared a total loss by his insurer. The plaintiff's insurer paid the fair market value of the

car to the dealer, which left the plaintiff owing the dealer over $9,000.00. The plaintiff

attempted to have IAS pay the balance owed on the vehicle under the DRWA policy.

However, IAS refused to pay the dealer the balance. The plaintiff eventually sued IAS, and

others, on several theories including bad faith settlement of the claim. The trial court

dismissed the action on summary judgment. The plaintiff appealed. On appeal, one of the

issues the appellate court addressed was whether the DRWA policy was insurance. The

opinion held that it was and stated as follows:

> The undisputed facts of this case show that Embry purchased and paid for a product that had for its purpose protection to him preventing him from owing a deficiency to the financing entity in the event of a total loss of his vehicle by accident or theft. The obligation to pay the deficiency is conditioned only upon the happening of the event and establishment of the "loss," that is, the destruction or unrecovered theft of the vehicle where the vehicle's primary insurance does not pay the balance due on the financing agreement.

> This Court holds that the DRWA program product purchased and paid for by Embry constitutes a contract of insurance. The DRWA Addendum is a contract in which, for consideration, a sum of money is to be paid upon the happening of an event or contingency and this is an insurance contract.

> The workings and purpose of the DRWA program product meet all elements of an insurance product as defined by the accepted definition of insurance, as well as the Oklahoma Insurance Code.

> Embry is entitled to the benefit of his bargain. . . .

8

> . . . This Court holds that the DRWA program product paid for by Embry is an insurance policy and that, because of its design, IAS, Hartford and Twin City may, if the proven facts warrant, be held liable for bad faith or negligence.

*Embry*, 198 P.3d at 393-94 (internal citations omitted).

In *Douglass v. Dynamic Enterprises, Inc.*, 315 Ark. 575, 869 S.W.2d 14 (1994), the Arkansas Supreme Court was asked to decide whether a debt cancellation contract offered by a used car dealer was insurance. The Court held that it was insurance based upon the following factors:

> The [Insurance] Commissioner cites a number of cases from other states where debt-cancellation contracts have been found to be analogous to credit-life policies, and thus insurance products within those states' definition of insurance. Review of these cases, as well as others, demonstrates that generally contracts with debt-cancellation clauses have been considered contracts of insurance . . . when: (1) the cancellation clause is mandatory, (2) the purchaser pays a fee for inclusion of the clause, (3) profit-making by the vendor is a major reason for including the clause, (4) risk of loss is placed on the purchaser, and (5) the vendor is not licensed or authorized to be in the business of insurance. Although not all of the factors listed above have been cited in any one case, we find these factors relevant to our evaluation, but not all are equally determinative.

*Douglass*, 315 Ark. at 578-79, 869 S.W.2d at 16-17 (internal citations omitted).

Similarly, in *Luc Leasing Corp. v. Muhl*, 659 N.Y.S.2d 422 (N.Y. Sup. Ct. 1997), a corporation engaged in the leasing of automobiles sought a declaration that a Lease

9

Completion Waiver ("LCW") it proposed to offer did not constitute insurance.  Under the LCW, the dealer would waive all additional monthly lease payments in the event the lessee died or became disabled during the term of the lease.  The dealer filed the action in response to a letter sent by the New York Superintendent of Insurance stating that a debt cancellation contract, under which the cancellation of the debt was dependent upon the happening of a fortuitous event, constituted the doing of an insurance business in the state.  The court agreed with the Superintendent as follows:

> According to [the Superintendent], the only distinction between the LCW and what is commonly offered by insurers as life insurance or accident and health insurance is that the LCW benefit involves a waiver of an existing obligation (i.e., payment of the balance of the leasing fee) where insurers more commonly obligate themselves to pay sums or to provide services.
>
> . . . .
>
> As the only issue is one of statutory interpretation, and there is no question of fact or factual interpretation, the court sua sponte grants [the Superintendent] declaratory judgment that the LCW option proposed by plaintiff would constitute the doing of an insurance business, as defined by the statute.

*Luc Leasing*, 659 N.Y.S.2d at 423-24.  *See Justice v. Branch Banking & Trust Co.*, No. 2:08-230, 2009 WL 853993, at *10 (S.D. W. Va. Mar. 24, 2009) ("[C]ourts of other states have found debt cancellation contracts to constitute insurance.  Given that the case law of West Virginia offers little guidance as to what constitutes insurance – and no guidance as to the proper characterization of debt cancellation contracts – it is possible that the courts [of] West Virginia will come to the same conclusion."); *Attorney Gen. v. C. E. Osgood Co.*, 249 Mass.

473, 477, 144 N.E. 371, 372 (1924) ("This constitutes insurance within the meaning of the statutory definition. The cancellation of the debt is the equivalent of the payment of money to the estate of the customer."); Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, 3 *Couch On Insurance*, § 1:23 (3d ed. 2009) ("Contracts providing that the obligation thereof shall be cancelled in case of death or other extrinsic event have been held to constitute contracts of insurance by several courts[.]").[9]

In the instant proceeding, Safe-Guard argues that the GAP Insurance is merely a debt cancellation agreement and not insurance. Safe-Guard's interpretation of the GAP Insurance is in conflict with the Insurance Commissioner's Informational Letter and the authorities cited above. The record in this case is clear. Safe-Guard was not the lender for the purchase of Ms. Hinkle's vehicle. Under the Informational Letter and our holding

---

[9]Ms. Hinkle cites to a reference in an article that indicates over a dozen states take the position that debt cancellation contracts are insurance. *See* James M. Cain, *Financial Institution Insurance Activities – Time for a GLB Act Upgrade?*, 58 Bus. Law. 1339, 1345 (2003) ("Over a dozen states, including New York, still take the express position that [debt cancellation contracts] . . . are to be regulated as insurance."). We have reviewed the article, and, for purposes of the facts of this case, the article is not on point. The institutions referred to in the article are banks that offer debt cancellation contracts directly to borrowers. In this case, we offer no opinion on banks offering debt cancellation contracts to consumers. *See Decohen v. Capital One, N.A.*, 703 F.3d 216, 225 (4th Cir. 2012) ("Capital One's list of cases in which courts have held debt cancellation agreements preempted by federal law are, without exception, instances in which national banks entered into the agreements at issue."). *See also* 12 C.F.R. § 37.1(c) ("National banks' debt cancellation contracts and debt suspension agreements are governed by . . . applicable Federal law and regulations, and not by . . . State law.").

11

incorporating the same, in order for the GAP Insurance to qualify as a debt cancellation agreement, Safe-Guard was required to be the lender of the loan. The record is clear in showing that Safe-Guard merely provided a product that was designed to indemnify the lender in the event Ms. Hinkle's vehicle was a total loss and she still had a balance owed to the lender. Thus, Safe-Guard's GAP Insurance constitutes insurance under the laws of West Virginia.

Safe-Guard has attempted to distance itself from the GAP Insurance by pointing out that it only acts as a "third-party administrator" of the product. According to Safe-Guard, when there is a deficiency on a loan after a vehicle has been totaled, "the lender will waive the balance of the loan and seek reimbursement from an insurance company."[10] The underlying arrangements that Safe-Guard may have with a third-party is of no moment to our decision. Safe-Guard held itself out as providing the GAP Insurance. The claim submitted by the Hinkles was made to Safe-Guard. The claim was denied by Safe-Guard by letter dated July 21, 2011. Safe-Guard's letter stated, "We have reviewed your Gap claim and have determined there is no benefit available under the Terms of your contract." Safe-

---

[10]Safe-Guard's petition refers to this arrangement as a CLIP agreement. "CLIP" apparently stands for Contractual Liability Insurance Policy. *See Deans & Homer, Inc. v. Commonwealth of Kentucky, Pub. Prot. Cabinet, Kentucky Dep't of Ins.*, No. 2012-CA-000012-MR, 2014 WL 341887, at *2 (Ky. Ct. App. Jan. 31, 2014) ("The appellants, being in the insurance business, had a product to cover precisely such risks; the product is known generally in the industry as a 'Contractual Liability Insurance Policy,' or 'CLIP.'").

Guard will not be allowed to collect, what in essence is a policy premium, but distance itself from all the responsibilities that go along with that policy premium. *See* Syl. pt. 2, *Hawkins v. Ford Motor Co.*, 211 W. Va. 487, 566 S.E.2d 624 (2002) ("The Unfair Trade Practices Act . . . and the tort of bad faith apply . . . to those persons or entities and their agents who are engaged in the business of insurance.").

Finally, Safe-Guard has cited to a number of statutes in other jurisdictions which indicate that a debt cancellation contract is not insurance. The statutes cited by Safe-Guard specifically require the creditor/lender provide the debt cancellation contract.[11] Thus, those statutes are consistent with the Insurance Commissioner's Informational Letter, which states that a debt cancellation contract is not insurance when a lender provides such coverage. The problem with Safe-Guard's argument is that the GAP Insurance issued in this case does not meet the definition of a debt cancellation contract as defined by the Insurance Commissioner. Simply put, Safe-Guard was not the lending institution.

---

[11]*See, e.g*., Ala. Admin. Code § 482-1-111-.03(j) (applicable to creditor); Del. Code Ann. tit. 5, § 2907 (applicable to banks); Ga. Code Ann. § 33-63-3(3) (applicable to creditor); Idaho Code Ann. § 28-41-106(5) (applicable to creditor); Iowa Code Ann. § 322.19 (applicable to dealer); Ky. Rev. Stat. Ann. § 190.100(7) (applicable to creditor); Mont. Code Ann. § 30-14-152(6) (applicable to creditor); Neb. Rev. Stat. § 45-1103 (applicable to creditor); N.Y. Ins. Law § 1101(b)(3) (applicable to creditor); N.C. Gen. Stat. Ann. § 66-440(5) (applicable to creditor); Ohio Rev. Code Ann. § 1317.05(B) (applicable to retail seller); Vt. Stat. Ann. tit. 8, § 10405(b)(2) (applicable to creditor).

**IV.**

**CONCLUSION**

For the foregoing reasons, the writ of prohibition prayed for is denied.

Writ Denied.