IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**February 8, 2024**
C. CASEY FORBES, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**THE MOUNTAIN LODGE ASSOCIATION,**
**Plaintiff Below, Petitioner**

**vs.) No. 23-ICA-1**   (Cir. Ct. of Pocahontas Cnty. Case No. 38-2020-C-24)

**SNOWSHOE MOUNTAIN, INC.,**
**Defendant Below, Respondent**

## MEMORANDUM DECISION

Petitioner The Mountain Lodge Association ("Association") appeals from the December 1, 2022, order of the Circuit Court of Pocahontas County. Respondent Snowshoe Mountain, Inc. ("Snowshoe") filed a response.[1] The Association filed a reply.

The issue on appeal is who is required to pay for maintenance and construction costs of the common elements within the Snowshoe Mountain Lodge ("Lodge"). The circuit court granted summary judgment in favor of Snowshoe, finding that the Association was responsible for all costs associated with the common elements.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The facts of the case are undisputed. The Lodge was built in 1982 and sits on a 5.01-acre tract of land in Pocahontas County. The Lodge is a single four-story structure. Its ground floor consists of a conference center owned by Snowshoe. The remaining three floors contain 229 condominium units known as the Mountain Lodge Condominium ("MLC") that is governed by the Association. The MLC is a common ownership community that is governed by the Uniform Condominium Act ("UCA"), West Virginia Code §§ 36B-1-101 to -4-115 (1980).[2]

---

[1] The Association is represented by Mark A. Sadd, Esq., and Ramonda C. Marling, Esq. Snowshoe is represented by Seth Hayes, Esq., and Dale H. Harrison, Esq.

[2] In 1986, the Legislature replaced the UCA with the Uniform Common Interest Ownership Act, West Virginia Code §§ 36B-1-101 to -4-120 (1986). However, the UCA

The Association's and Snowshoe's obligations related to the Lodge are contained in a collection of four documents, collectively referred to in the record as the "Project Documents." The Project Documents were executed over forty years ago and related to the Lodge's development and include: (1) the April 12, 1982, deed from Snowshoe to Commonwealth Group ("Commonwealth Deed") for the tract upon which the Lodge was constructed;[3] (2) the November 10, 1982, deed from Commonwealth Group to Snowshoe, conveying ownership of the conference center space ("Conference Center Deed"); (3) the Declaration of the Mountain Lodge Condominium ("Declaration"), which established the MLC and the Association; and (4) the Development Agreement between Commonwealth Group and Snowshoe ("Development Agreement").[4]

Since 1982, the MLC and Snowshoe's conference center have operated as separate and distinct entities. Despite operating under the Project Documents for decades, tensions arose between the parties when the Association asserted that Snowshoe should be contributing to costs associated with the common elements of the MLC. This dispute resulted in the underlying litigation.

On January 29, 2021, the Lodge filed its second amended complaint containing ten claims for relief, which can be summarized as follows: Counts I through IV requested relief under the UCA; Count V sought relief under the common law principles regarding easements and servitudes; Count VI alleged breach of contract under the Conference Center Deed; Count VII alleged quantum meruit; Count VIII claimed unjust enrichment; Count IX sought reformation of the Conference Center Deed and the Declaration; and Count X sought rescission of the Conference Center Deed. Cross-summary judgment motions were eventually filed and later heard by the circuit court on May 19, 2021.

On December 1, 2022, the circuit court entered the order currently on appeal. Regarding Counts I through IV, the circuit court found that the UCA set forth that it only applied to condominiums and that the conference center did not meet the statutory definition of a "condominium," nor did it meet the definition of a condominium "unit." *See* W. Va. Code §§ 36B-1-103(7) and -103(23) (1980). Instead, the circuit court found that

---

applies to this case because it was the statutory scheme in effect when the Project Documents were drafted and signed.

[3] Following a new survey, the parties executed a corrective deed on October 26, 1982, to correct minor variances in the calls and distances for the boundaries of the 5.01-acre tract. Otherwise, the deed remained unchanged.

[4] The Commonwealth Group and Snowshoe Company were the original parties to these documents. Commonwealth Group was the developer of the project and transferred its rights to the Association. Snowshoe Company is now known as Snowshoe Mountain, Inc.

the Conference Center Deed and the Declaration clearly expressed that Snowshoe owned the conference center in fee, separate and apart from the MLC, and that Snowshoe was exempt from contributing to common element maintenance.

The circuit court rejected the Association's argument that the conference center conveyance to Snowshoe was an attempt to evade the limitations of the UCA, and that the conference center should be treated as a condominium. The circuit court found that this argument was contrary to the clear intention of the parties when the Project Documents were signed. It also found that the Association had failed to set forth any authority to support its proposition. The circuit court found that the legislative purpose of the UCA was to require full compliance with the statutory scheme by all condominiums subject to it, but not to require a property owner to place all its real property into a condominium form of ownership. *See* W. Va. Code § 36B-1-104 (1980).

The circuit court also found that by its terms, the UCA did not apply to any property that was not subject to a declaration made pursuant to the UCA's provisions. In this case, it was determined that the conference center was clearly noted by the Declaration as being separate from the MLC. Further, upon execution of the Conference Center Deed, Snowshoe owned the conference center and Commonwealth Group owned the remainder of the 5.01-acre tract and used the UCA to create the MLC, which expressly excluded the conference center. The circuit court held that the MLC's creation did not alter the legal relationship between Snowshoe and Commonwealth Group or their successors in interest, and that the Association failed to set forth any authority to support its position that the UCA abrogated the common law relationship between the parties. Ultimately, the circuit court concluded that the UCA did not govern the relationship between the parties and the Association was not entitled relief on those counts.[5]

The circuit court next addressed common law principles regarding easements and servitudes as alleged in Count V. Here, the circuit court found the Association was not entitled to relief because the Conference Center Deed established a contractual obligation for the MLC as the servient estate, to maintain any property subject to easements. In other words, the circuit court determined that the clear language of the Conference Center Deed created no contractual obligation for Snowshoe to contribute to any costs for the upkeep of those portions of the Lodge owned by the Association and that the Conference Center Deed expressly limited Snowshoe's obligation to the conference center. The circuit court further concluded that it was not inequitable or unconscionable for Snowshoe to receive the benefit of the easements secured by its predecessor in title, without paying for their upkeep when

---

[5] In addressing Counts I through IV of the second amended complaint, the circuit court also addressed whether, at common law, a party could own a specific portion or space within a structure, when that structure and the ground on which it is constructed is owned by another. However, because we resolve this case on other grounds, we do not need to address that ruling in this decision.

3

the Conference Center Deed expressly placed that contractual obligation upon the MLC and the Association. Based upon this reasoning, the circuit court also rejected the Association's breach of contract, quantum meruit, and unjust enrichment claims raised in Counts VI to VIII.

The circuit court also declined to reform or rescind the Conference Center Deed or Declaration as requested by the Association under Counts IX and X. First, the circuit court found that courts cannot reform contracts that plainly express the parties' intentions. Next, it noted that rescission was a remedy vested in the sound discretion of a court and found that because the Association failed to establish that it was entitled to relief under any of its claims, rescission was not an appropriate remedy.

The circuit court awarded summary judgment to Snowshoe on each count in the second amended complaint and dismissed the case. This appeal followed.

Our review of a circuit court's entry of summary judgment is *de novo*. Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 190, 451 S.E.2d 755, 756 (1994). In conducting a *de novo* review, this Court applies the same standard for granting summary judgment that a circuit court must apply, and that standard states, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *United Bank, Inc. v. Blosser,* 218 W.Va. 378, 383, 624 S.E.2d 815, 820 (2005) (quoting *Painter*, 192 W. Va. at 190, 451 S.E.2d at 756, syl. pt. 2). "Summary judgment is appropriate if, from the totality of the evidence presented . . . the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 56, 459 S.E.2d 329, 333 (1995). "[T]he party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." *Id.* at 60, 459 S.E.2d at 337 (quotations and citations omitted).

On appeal, the Association raises several assignments of error. However, upon review, we find that resolution of this case rests on two dispositive issues: (1) whether the Project Documents create a contractual obligation for Snowshoe to contribute to the costs of the MLC's common elements; and (2) whether the circuit court erred in its application of the UCA. We will discuss these points separately.

Our first inquiry centers on the circuit court's interpretation of the Project Documents. As previously established, these documents consist of the Commonwealth Deed, Conference Center Deed, Declaration, and the Development Agreement. Because the focus of the circuit court's decision and the parties' arguments on appeal rely on the language of the Conference Center Deed and the Declaration, those two Project Documents will be the focal point of our analysis.

4

At the outset, we note that at their core, the Conference Center Deed and Declaration are viewed as contracts. *See, e.g., Arnold v. Palmer*, 224 W. Va. 495, 503, 686 S.E.2d 725, 733 (deeds are subject to the principles of interpretation and construction that govern contracts generally) (quotations and citations omitted); *Anania v. Snowshoe Mountain Inc.*, No. 13-0406, 2014 WL 2694219, at *3 (W. Va. May 30, 2014) (memorandum decision) (applying contract law to a condominium declaration); *Maher v. Camp 4 Condo. Ass'n,* __W. Va. __, 895 S.E.2d 836, 843 (W. Va. Ct. App. 2023) (affirming circuit court's application of contract law to interpret a condominium declaration). Thus, we begin our analysis mindful of the following tenets of contract law:

> In construing the terms of a contract, we are guided by the common-sense canons of contract interpretation. One such canon teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning. *Payne v. Weston,* 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1985). Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken . . . . "A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." [*Williams*, 194 W. Va. at 65, 459 S.E.2d at 342].

*Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont,* 196 W.Va. 97, 101, 468 S.E.2d 712, 716 (1996). "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. Pt. 1, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W. Va. 252, 162 S.E.2d 189 (1968). Moreover, "[t]he interpretation of [a] . . . contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." Syl. Pt. 2, in part, *Riffe v. Home Finders Assocs., Inc.*, 205 W. Va. 216, 217, 517 S.E.2d 313, 314 (1999).

Upon review, the Conference Center Deed expressly conveys, through metes and bounds, the conference center portion of the Lodge to Snowshoe, its successors, grantees, and assigns. Further, the Conference Center Deed reserved the remaining portions of the Lodge and the 5.01-acre tract, which together make up the MLC, to the benefit of Commonwealth Group. The Conference Center Deed states that Commonwealth Group excepted and reserved certain rights to, and easements for, specific uses of the conference center that are necessary for the joint ownership of the Lodge complex. This instrument also states that Commonwealth Group granted similar rights to Snowshoe with respect to the remaining portions of the Lodge.

5

The Association contends that these provisions place a contractual obligation upon Snowshoe to contribute to the maintenance and upkeep costs of the MLC's common elements; however, no such obligation exists. Instead, the Conference Center Deed firmly establishes that Snowshoe owns the conference center; the Association, as a successor in interest, owns all other portions of the Lodge (including the common elements) and adjoining 5.01-acre tract and that these areas are clearly defined by this instrument.

The Conference Center Deed also states that its grants, reservations, and exceptions "shall be appurtenant to the estate benefited thereby . . . but shall not also be for the benefit and the use of the burdened estate[.]" Its plain language further sets forth that its terms and conditions run with the land and are intended to "inure to the benefit of the estate and the owner intended to benefit thereby and to bind and charge the estate and owner intended to be bound thereby[.]" Most significantly, the Conference Center Deed clearly states: "Each party hereto agrees to repair, replace, restore and maintain all those portions of the [Lodge] and equipment in connection therewith owned by it unless otherwise mutually agreed upon." (emphasis added).

Even though the Conference Center Deed provides both Snowshoe and the Association with permissive rights of access to each other's property for the purposes of ingress and egress, including Snowshoe's right to access the MLC's common elements, the Conference Center Deed contains no covenant or obligation for Snowshoe to contribute to the costs associated with the common elements, nor does the Association have an obligation to contribute to those similar costs of the conference center. Rather, the Conference Center Deed expressly states, in plain terms, that that parties clearly intended for the Association to be solely responsible for the costs of repair, maintenance, and upkeep of the MLC's common elements. Similarly, the Conference Center Deed establishes a clear intention to place this same obligation with respect to the conference center upon Snowshoe.

Likewise, the Declaration expressly incorporates the same grants, exceptions, and reservations contained in the Conference Center Deed with respect to both the Commonwealth Group and Snowshoe. The Declaration excludes the conference center property from the MLC, and places no obligation upon Snowshoe, as the owner of the conference center, to contribute to the cost of the maintenance and upkeep of the MLC's common elements. Critically, Article I of the Declaration states that "[t]here is excepted from this submission and Declaration that portion of the aforesaid 5.01[-]acre tract known as the 'Conference Center' conveyed by . . . [the Conference Center Deed]." Included in its description of the MLC, this Article states: "The Conference Center[,] which is not a part of the condominium but which has been deeded to Snowshoe Company and will be owned and operated by it and its successors, grantees and assigns is excluded from the submission."

6

Article III of the Declaration described the relationship between Snowshoe and the Association as follows:

> Except for certain easements appurtenant to the Condominium . . . unit owners within the Condominium will have no rights with respect to the Conference Center which will not be a part of the Condominium and the owner of the Conference Center will have no rights with respect to the Condominium and will not be responsible for payment of any portion of the Condominium expenses normally incident to the ownership of a condominium unit.

Further, Article IV of the Declaration defines the "units" and "common elements" comprising the MLC. It states that there shall be a maximum of 229 units within the MLC, consisting of "eight different [unit] types and Unit 139[.]" The conference center is not identified as a unit or type of unit, nor is any unit description consistent with the description of the conference center. Instead, the Declaration states "[t]he common elements of the [MLC] consist of all of the land making up the 5.01[-]acre tract except that portion which is part of the Conference Center[.]"

The Declaration assigns each condominium owner an undivided interest in the common elements of the MLC based upon the square footage of his or her individual unit, and an owner's voting rights within the Association is equal to that undivided ownership interest. The Declaration further provides: "Each Unit Owner shall be liable for that portion of the Common Expenses equal to his unit's percentage interest in the common elements. Likewise, each Unit Owner's interest in any common surplus shall be equal to his interest in the common elements."

These ownership interests are expressly listed within Exhibit 5 of the Declaration for each of the 229 units, totaling 100%. However, the conference center is not included within that list, nor does the document include the square footage of the conference center in its calculation. Moreover, the Declaration also references four plats that were recorded with the Declaration. These plats illustrate the Lodge's four floors and, according to those plats, the conference center is excluded from the MLC.

The Declaration also unequivocally states that the common elements belong to MLC unit owners and that all costs related to the "maintenance, repair, replacement, preservation[,] and improvement of the common elements" are the responsibility of those owners and the Association. Therefore, the Declaration imposes no legal obligation upon Snowshoe to assist with the costs of the common elements.

The final issue we must address is the circuit court's application of the UCA. On this issue, the Association contends that the circuit court erred by not finding the conference center to be a "unit" as defined by the UCA, and by not finding that the UCA controlled

the creation of the conference center as an integrated part of the Lodge. Because these two arguments center on the application of statutory language, we turn our attention to the UCA to determine if its language encompasses the conference center. We begin our analysis by noting, "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly,* 135 W. Va. 877, 65 S.E.2d 488 (1951).

Regarding the scope of its applicability, West Virginia Code § 36B-1-102(a) (1980) states that the UCA, "applies to all *condominiums* created within this State after the effective date of this chapter [July 1, 1980]." (emphasis added). The UCA clearly defines a "condominium" to "mean real estate, portions of which are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of those portions. Real estate is not a condominium unless the undivided interest in the common elements are vested in the *unit owners*." W. Va. Code § 36B-1-103(7) (emphasis added). Under the UCA, a "unit owner" is:

> [A] declarant who *owns a unit*, a person to whom ownership of a unit has been conveyed, or a lessee of a unit in a leasehold condominium . . . but does not include a person having an interest in a unit solely as security for an obligation.

W. Va. Code § 36B-1-103(24) (1980) (emphasis added). Further, a "unit" refers to "a portion of the condominium designated for separate *ownership*, the boundaries of which are described pursuant to [West Virginia Code § 36B-2-105(4) (1980) (requiring condominium declarations to contain a description and identifying number of each condominium unit)]." W. Va. Code § 36B-1-103(23) (emphasis added).

The UCA's language is clear and unambiguous and must be applied as written. Upon its application, the UCA does not apply to the conference center, and the conference center does not meet the definition of a unit or condominium under the UCA. Further, the UCA only applies to condominiums whose real estate is designated solely for separate and common ownership by the condominium unit owners. Here, unlike the MLC, the conference center meets none of those requirements. The Conference Center Deed plainly shows that the conference center is owned separately by Snowshoe in fee and was not designated for division into individual units for separate ownership.

Therefore, the UCA does not govern the conference center or the parties' contractual relationship. As previously established, the Conference Center Deed and the Declaration clearly set forth that the Association owns the MLC portion of the Lodge, and that Snowshoe owns the area designated as the conference center. The conference center does not hold an ownership interest in the MLC or the Association as a condominium unit owner. As such, the conference center is not subject to the UCA, and its owner has no statutory duty to contribute to the costs of the MLC's common elements.

8

In sum, there are no genuine issues of material of fact, and Snowshoe has no contractual or statutory obligation to contribute to the costs associated with the MLC's common elements. Because the existence of such an obligation is paramount to the Association's remaining claims in its second amended complaint, we do not need to address the Association's other assignments of error.

Accordingly, we concur with the circuit court's determination that summary judgment was appropriate and hereby affirm its December 1, 2022, order.

Affirmed.

**ISSUED:** February 8, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear